## APPEALS OF WALLIS TRACTOR CO. AND J. I. CASE PLOW WORKS.

Docket Nos. 663, 664. Submitted March 30, 1925. Decided March 5, 1926.

1. The par value of shares of stock issued for assets is not conclusive of the actual cash value or of the fair market price or value of such assets for the purpose of determining invested capital or profit or loss on sale or a reasonable amount for obsolescence.

2. In 1918 the Wallis Tractor Co. charged off its books of account an amount for obsolescence of drawings, blue prints, tracings, etc. *Held*, that the actual cash value at the date of acquisition of such drawings, blue prints, tracings, etc., destroyed, is an allowable deduction from gross income.

3. In connection with the refinancing of the two taxpayer corporations all the assets of each, without liabilities, were sold to a new corporation, organized under the laws of a different State, in exchange for all its shares of capital stock, and a portion of the shares of stock received by each corporation was sold for cash. *Held*, that the taxpayer corporations realized a profit or loss in 1919 measured by the difference between the depreciated cost of the assets transferred to the new corporation and the fair market value of the shares of stock received in exchange. *Held, further*, that each corporation realized a profit from the sale of a portion of its shares of stock for cash measured by the difference between the fair market value of the shares at the date of receipt and the amount of cash received upon the sale.

*William C. Quarles, Esq.*, for the taxpayers.
*George K. Bowden, Esq.*, for the Commissioner.

Before GRAUPNER, LANSDON, LITTLETON, and SMITH.

These appeals are from determinations of deficiencies in income and profits tax as follows:

*Wallis Tractor Co.*

| Year. | Deficiency. |
|---|---|
| 1917 | $49,093.11 |
| 1918 | 269,515.69 |
| 1919 | 373,297.49 |
| 1920 | None. |
| | 691,906.29 |

*J. I. Case Plow Works.*

| Taxable year. | Deficiency. |
|---|---|
| June 30, 1917 | $4,200.00 |
| June 30, 1918 | 51,100.16 |
| June 11, 1920 | 380,240.33 |
| | 435,540.58 |
| June 30, 1919, overassessment | 4,494.45 |
| Net deficiency in tax | 431,046.13 |

Many of the facts which have a bearing upon alleged deficiencies of tax of these taxpayers are common to both corporations. It was stipulated that the brief, stipulated facts, and evidence in the appeal of the Wallis Tractor Co., in so far as material, should be considered applicable to the appeal of the J. I. Case Plow Works. The appeals were heard and argued together.

In 1919 the taxpayer corporations sold all their assets, without liabilities, to the J. I. Case Plow Works Co., a Delaware corporation, for all the shares of capital stock of such corporation, and sold a portion of the shares received for cash. The principal point in issue in each appeal is the profit, if any, realized from these transactions.

FINDINGS OF FACT.

1. The J. I. Case Plow Works (hereinafter called the Plow Works) was organized as a corporation in 1885 under the laws of the State of Wisconsin. It was authorized to engage in the manufacture and sale of all kinds of plows, harrows, mowers, reapers, cultivators, and such other kinds of agricultural machinery and implements as its stockholders might from time to time agree upon. It engaged in the manufacture and sale of such implements from the date of its organization to the fall of 1919, when its business and assets were sold and transferred to the J. I. Case Plow Works Co., a Delaware corporation. H. M. Wallis was connected with the Plow Works continuously from its organization in 1885 up to the time of the sale of its business and was president and general manager from 1890.

2. During the years 1909, 1910, and 1911, a demand arose for farm tractors, and several different types were placed upon the market by different manufacturers. The stockholders of the Plow Works were interested in this development and closely studied it, because their company was manufacturing various types of plows and harrows and tillage implements designed and intended to be tractor drawn.

By 1911 it was becoming increasingly difficult for the company to sell this portion of its products to concerns which were manufacturing tractors, because of the increasing practice of the manufacturer to build both tractor and implement, selling the same as a unit. For a year or more prior to 1912 Wallis caused the engineers and experimental men in the employ of the Plow Works to make a careful examination, study, and test of the various tractors then upon the market. During this investigation they brought to Wallis's attention a tractor which had been developed and was then owned by one O. P. Conger, which was protected by patents and patent applications and which had been actually experimented with in field tests for about a year. Wallis caused his engineers and practical men to make a thorough investigation and test of this machine. The results of these tests convinced him, his representatives, and the stockholders of the Plow Works that the Conger tractor embodied new and novel features of essential merit, as, for example, that it was a four-cylinder machine—most, if not all, of the others then upon the market being two-cylinder machines—that the power developed by it was greatly in excess of that of any other tractor of almost double its weight, that it was the only machine upon the market whose moving parts were inclosed and running in oil, that it was the only machine which was spring mounted with cut-steel gears, etc. The engineers reported to the directors of the Plow Works that it would necessarily require from three to five

years of development and field tests to duplicate this kind of a tractor and would necessarily involve extremely large expenditures, estimated at from $500,000 to $1,000,000.

3. After the tests and investigation of the Conger tractor had been completed, Wallis was authorized by the stockholders and directors of the Plow Works to negotiate with Conger for the purchase of his patents, patent applications, drawings, tracings, blue prints, engineering data, etc., and said negotiations were begun in 1912.

On or about September 23, 1912, Wallis and Conger entered into a written agreement whereby the parties agreed that a corporation should be formed under the laws of Wisconsin, to be known as the Wallis Tractor Co. (hereinafter called the Tractor Co.), the object of which should be the manufacture and sale of traction engines and all other types of internal-combustion engines; it was to have a capital stock of $800,000, divided into 8,000 shares of a par value of $100 each, 2,000 of which were to be nonvoting cumulative 7 per cent preferred shares and the remaining 6,000 common shares. The 6,000 common shares and 500 of the preferred shares were to be issued to Conger upon his assigning to the corporation the patents and applications for patents, and the drawings, tracings, engineering data, etc., relating to the tractor. Conger agreed to make such conveyance, and, contemporaneously with the issue to him of the 6,000 shares common and 500 shares preferred, agreed to assign, transfer, and convey to Wallis 4,200 shares of the common stock and 150 shares of the preferred. Wallis agreed to pay Conger $15,000 cash upon the execution of the contract. He further agreed that, when the corporation was fully organized, he would subscribe at par for 1,000 shares of the new company's preferred stock, to be paid for as called for by the board of directors.

4. The board of directors of the Tractor Co. on October 15, 1912, adopted the following resolution:

Whereas this company has been organized for the purpose of manufacturing, selling and dealing in traction engines and all types and styles of internal combustion engines and other machinery and implements; and

Whereas, for the conduct and establishment of said business it is necessary to secure certain patents, patent rights, blueprints, etc.; and

Whereas, one Oliver P. Conger, of Cleveland, Ohio, has represented himself as being the owner of the following patents and various serial applications for patents, as follows, to-wit:

United States Patent No. 985,566, issued February 28, 1911; patent application by Robert O. Hendrickson, upon improvements in governor heads, application made June 20, 1911, assignment of same to said Conger being recorded July 3, 1911, in the United States Patent Office; application by Robert O. Hendrickson, upon improvements in steering gears, application made June 20, 1911, assignment of same to said Conger being recorded July 3, 1911, in the

United States Patent Office; application by Robert O. Hendrickson, January 25, 1911, under Serial No. 604,539; application by Robert O. Hendrickson, upon improvements in traction engines, said application being made May 31, 1911, and the assignment of which to said Conger is recorded June 8, 1911; application by Robert O. Hendrickson upon improvements in friction clutches, said application being made June 20, 1911, and the assignment of which to said Conger is recorded July 3, 1911; application by Robert O. Hendrickson, for improvements in cooling systems for explosive engines, dated January 25, 1911, under Serial No. 604,540; application by Robert O. Hendrickson, upon systems for cooling explosive engines applied for January 18, 1911, the assignment to said Conger of the said application being dated January 25, 1911;

And whereas, said Conger is also the owner of certain full and complete detailed drawings or blueprints of certain traction engine which the said Conger has developed and constructed; and

Whereas, the said Conger has offered to convey to this company all of his rights, title and interest in and to all of the said patents, patent rights, blueprints and any patents or serial applications or improvements upon tractors not yet protected by application other than those specifically herein mentioned, in or to which the said Conger may have any right, title or interest whatsoever, all in consideration of the transfer to the said Conger by this corporation of six thousand shares of the common stock of this corporation and five hundred shares of the preferred capital stock of this corporation, as shown by the offer of said Conger in writing herewith filed; and

Whereas, a careful examination of said patents, patent rights and blueprints has been made by the directors of this company and in their opinion they are of great value; and

Whereas, the use of said patents and patent rights are necessary for the commencement and carrying on of the business of this company;

Now therefore, be it resolved, that the said offer of the said Conger be and is hereby accepted and the officers of this corporation be and are hereby duly authorized and directed upon the receipt from the said Conger of the said transfers of the said patents. patent rights, and the delivery of the said blueprints, to receive the same in full payment of the said six thousand shares of the common stock of this company and five hundred shares of the preferred stock of this company, and to issue and deliver to the said Conger said stock.

The above motion prevailed, all of the directors voting in favor thereof except Mr. Conger, who did not vote.

Whereupon the meeting adjourned.

In the negotiations there was no segregation of valuation as between the patents and the drawings, tracings, and blue prints, but H. M. Wallis at all times regarded the drawings, tracings, and blue prints as being of the major value.

On or about October 15, 1912, Conger assigned to the Tractor Co. all the patents, drawings, tracings, and blue prints above referred to. Three days later 6,000 shares common and 500 shares preferred stock of the Tractor Co. were issued to Conger. At the same time Conger transferred to Wallis 4,200 shares of the common and 150 shares of the preferred stock, and received $15,000 cash as per the agreement. The only consideration for the transfer by

Conger of the 4,200 shares of common and 150 shares of preferred stock was the payment of $15,000 by Wallis to Conger and the undertaking of the former to subscribe for $100,000 of the preferred stock at $100 a share and to finance the Tractor Co. It was contemplated by all the interested parties that the Tractor Co. would need several hundred thousand dollars of capital to put it on its feet. Wallis for a number of years used his own personal estate to assist in financing the Tractor Co., at times indorsing its notes to the bank to the amount of $250,000. At his own expense he took life insurance to the amount of one quarter of a million dollars. He caused the Plow Works, in which he then owned the control, to make contracts with the Tractor Co. to buy and pay for its product as and when manufactured and to take sole charge of selling and servicing the tractors and making all collections therefor, and he waived all salary as president of the Tractor Co. for several years.

5. The Tractor Co. commenced business promptly after its organization in the fall of 1912, and up to October 1, 1914, had expended over $100,000 in developing, advertising, and creating a demand for the tractor manufactured by it in accordance with the designs covered by the patents and applications for patents and pursuant to the drawings and tracings transferred to it by Conger. From the time of its organization in 1912 and throughout 1913 it proceeded to manufacture a tractor known as "Model B," which was made in accordance with the original drawings, tracings, blue prints, and data acquired from Conger. Ten of the "Model B" tractors were manufactured. All of these were sold and at the time of the hearing were still in service. The "Model B" tractor was somewhat larger than the Conger tractor, and proved to be too large to meet the popular demand. Accordingly, "Model C" was constructed, of which approximately 50 were built. Later "Model D" was constructed, which was a refinement of "Model C." Several hundred of these were manufactured. Models "C" and "D" followed closely the original drawings, blue prints, etc., and embodied many of the patented features acquired from Conger. In 1917, because of a popular demand, a still smaller tractor was constructed, called "Model J," which throughout was a radical departure from the previous models, being different in weight, weight distribution, appearance, and size, having an entirely new design of engine and an entirely new transmission system, and being different as to clutch, oiling system, and other essential and important features. It is agreed that it was a new design. .

6. In December, 1918, after careful consideration of the various phases of tractor development, officials of the Tractor Co., upon

proper direction, caused to be destroyed all the original drawings, blue prints, tracings, etc., acquired from Conger, and a part of those made in connection with " Model B." The company wrote off its books at that time the sum of $250,000, representing the alleged cost of the drawings, tracings, etc., which it considered had become obsolete and useless, charging $200,000 of this amount against the drawings, tracings, etc., acquired from Conger and $50,000 against those made for " Model B."

7. Beginning with 1915, the following is a record of the sales of tractors made by the Tractor Co.:

| Made for— | 1915. | | 1916. | | 1917. | | 1918. | | 1919. | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Number. | Amount. | Number. | Amount. | Number. | Amount. | Number. | Amount. | Number. | Amount. |
| Plow Works | 95 | $113,700 | 217 | $279,170 | 629 | $818,595 | 1,783 | $1,564,375 | 1,165 | $1,163,725 |
| Others | 9 | 15,350 | 31 | 52,365 | 28 | 40,434 | 19 | 26,552 | 6 | 7,801 |
| Export | | | | | 152 | 149,625 | 729 | 862,067 | | |
| | 104 | 129,050 | 248 | 331,535 | 1,009 | 1,008,654 | 2,531 | 2,452,994 | 1,174 | 1,171,526 |

*Summary.*

| | | |
|---|---|---|
| Plow Works | 3,089 | $3,939,565 |
| Others | 93 | 142,502 |
| Export | 881 | 1,011,692 |
| | 4,063 | 5,093,759 |

8. In the year 1919 the business of the Tractor Co. had developed to such a point that it was in need of additional working capital. H. M. Wallis had financed the Tractor Co. to the limit of his personal fortune, and the Plow Works had exhausted its credit at banks in financing it. Wallis had been endeavoring to refinance the Tractor Co. for some time, but without success, for the reason that the company had no history of years of profit back of it. It was regarded by bankers more or less in the light of a new enterprise or new venture. The directors of both companies were giving consideration to the advisability of bringing about a refinancing of the two corporations by merger, consolidation, or some other means of increasing the working capital of the organization.

9. In June, 1919, Wallis, president of the Tractor Co. and of the Plow Works, had a number of interviews with W. G. Souders, of Souders & Co., of Chicago, investment bankers, engaged in the business of buying and selling securities, relative to the advisability of refinancing the Tractor Co. and the Plow Works or of bringing about a merger of them or a sale of their assets to a new corporation. Before he would enter into any agreement with Wallis,

Souders stipulated that, if he was going to assist in the refinancing operations, a new corporation would have to be formed to which should be transferred the assets of the old companies, without liabilities. Souders did not want to undertake to market all of the stock of the new corporation. He said that if Wallis would retain a part of the second preferred stock and a portion of the common, he thought he could interest some additional financial interests with him. Souders also stipulated that the combined assets of the taxpayer corporations to be paid in to the new corporation on a valuation of Arthur Young & Co. should be at least $7,000,000. Wallis agreed to the terms laid down by Souders. The combined assets of the two corporations on a valuation by Arthur Young & Co. was slightly less than $7,000,000, and Wallis himself had to make up personally about $90,000 in order that the quick assets should bear a ratio of one and one-quarter to three and one-half for the fixed assets.

An integral and essential portion of this original agreement and of each and every succeeding agreement between Souders & Co. and Wallis, acting for the two taxpayers, was:

(a) That Souders & Company would deal only with Wallis as owner of all of the capital stock of the Wallis Tractor Company and of the J. I. Case Plow Works.

(b) That Wallis should accept and retain the presidency of the new company for a period of at least two years from the date of its organization.

(c) That for said period of at least two years the Tractor Company and the Plow Works should at all times retain the ownership of 51 per cent of the common no par value stock of the new company—which had the exclusive voting power and which would thus insure the retention of Wallis as president for said two year period.

(d) That neither the Wallis Tractor Company nor the Plow Works should during the continuance of the syndicate formed by Souders & Company to sell the stocks of the new company, sell or dispose of any of the second preferred stock of said new company, except to their own employees or the employees of the new company, who must likewise agree not to sell the same.

The reason why the foregoing provision (d) was insisted upon by Souders & Co. was to enable them and the members of their syndicate to influence, stimulate, and support the market prices of the stocks of the new company, which they had purchased from the old companies and which they had for sale, uninfluenced by offerings of any stock by the old companies. Each of the old companies and Wallis fully lived up to and performed the foregoing terms and provisions of the contract.

10. After Wallis had had one or more interviews with Souders, he called meetings of the stockholders of the two taxpayer corporations to determine what action they would take upon the propositions made by Souders. It was voted to accept them. There were then outstanding 6,000 shares common and 2,000 shares preferred

stock of the Tractor Co., of which Wallis owned 2,494 common and 150 preferred, and 4,000 shares common and 1,949 preferred of the Plow Works, of which Wallis owned 1,250 shares common and 150 shares preferred. The stockholders of the former company agreed to sell their shares of both classes of stock to Wallis at $100 a share, and the stock was all acquired by Wallis at that price, with the exception of a few shares of preferred stock the owner of which could not be located, which shares were called in and acquired at the callable price. The common stockholders of the Plow Works agreed to sell their shares at $300 each, except that a small minority interest held out for a higher price, and, with the consent of all, were paid $450 a share. The preferred stock of that company was called in at $115 a share plus accrued dividends. Each stockholder gave to Wallis a written option on his stock. Certificates for their shares of stock were deposited in escrow with the First Wisconsin Trust Co. and in due course the stockholders received the amount of money for which they had contracted to sell.

11. The J. I. Case Plow Works Co., the new corporation contemplated by the agreement made between Wallis and Souders & Co., was organized under the laws of the State of Delaware in September, 1919, with a capital stock of $7,000,000 preferred stock, divided into 35,000 shares of first preferred stock and 35,000 shares of second preferred stock, each of a par value of $100, and 125,000 shares of no par value common stock.

12. The following is a copy of a part of a resolution adopted by the stockholders of the Tractor Co. on September 11, 1919, at 10 a. m:

The following resolution was offered by W. M. LaVenture, seconded by H. M. Wallis, Jr., and being put was unanimously adopted, all of said stock voting therefor:

Whereas, negotiations have been had during a number of weeks prior hereto between the officers of this company and the officers of the J. I. Case Plow Works Company, a corporation, organized under the laws of the State of Delaware, relative to the purchase and sale of all of the assets, business, good will, etc., belonging to this company, as well as the purchase and sale to said Delaware Company of all of the assets, good will, etc., of the J. I. Case Plow Works of Racine, Wisconsin; and

Whereas an audit was made by Arthur Young & Company, certified public accountants, of the books, records, papers, documents, stock, material, and finished product of this company as of June 30, 1919, which said audit shows that the total assets of this company on said date had a value of $1,730,644.73
* * *

And whereas, the stockholders of this company have carefully considered the value of said assets and are satisfied that on said June 30, 1919, they were reasonably worth the sum of $1,730,644.73; and

Whereas, the stockholders of this company have given careful thought and much consideration to the question of the advisability of selling and disposing of the assets of this company and have come to the conclusion that it

is for the best interest of this company that its assets and business should be merged, joined and united with the business and assets of the said J. I. Case Plow Works and that the consolidated business be conducted under one management;

Now, Therefore, Be It Resolved, that this company offer to sell all of its assets of every kind, nature and description, tangible and intangible, and wherever situate, together with its good will, patent rights, trade-marks, etc., unto the said J. I. Case Plow Works Company of Delaware, for the following described securities, to-wit:

\*      \*      \*      \*      \*      \*

That the Wallis Tractor Company shall pay all of its debts, liabilities and obligations as they existed on June 30, 1919, and that said J. I. Case Plow Works Company shall assume and agree to pay all debts, obligations and liabilities incurred in connection with the operation of said Wallis Tractor Company since June 30, 1919.

That the Wallis Tractor Company shall assign, transfer and set over unto said J. I. Case Plow Works Company all of its contracts of every kind and nature as they existed on said June 30, 1919, or at the time of transfer, which it can legally assign, and said J. I. Case Plow Works Company shall assume and agree to carry out and perform the same, and all the obligations thereof agreed to be performed by said Wallis Tractor Company.

That the said J. I. Case Plow Works Company shall be entitled to receive and retain all profits or gains resulting from the operation of the business carried on by the said Wallis Tractor Company from the close of business on June 30, 1919, up to the date of this transfer, by [*sic*] said J. I. Case Plow Works Company shall, on or prior to sixty days from the date of the transfer of said assets, pay to the said Wallis Tractor Company five per cent upon the sum of One Million seven hundred and fifty thousand dollars ($1,750,000) from June 30, 1919, up to the date of the making of said payment.

That the said assets shall be conveyed and transferred by good and sufficient conveyances.

Be It Further Resolved, that the officers of this company be and they hereby are authorized, instructed and directed to put this offer into proper form, deliver the same to the said J. I. Case Plow Works Company and upon acceptance thereof to do every act reasonable, necessary or proper in the premises to bring about, fully perform and carry out the terms and conditions of said agreement and transfer.

That this offer shall be good only for the period of fifteen days from the 11th day of September, 1919, and if not accepted shall be void and of no effect.   \*   \*   \*

The following is a copy of a portion of the minutes of a stockholders' meeting of the Tractor Co. held September 11, 1919, at 3 p. m., and sets out the agreement between the Tractor Co. and Souders & Co.:

The following resolution was offered by Mr. Quarles, seconded by Mr. H. M. Wallis, Jr., and being put was unanimously adopted, all of the stock voting therefor:

Whereas, this company has heretofore sold, transferred, conveyed and disposed of all of its assets to the J. I. Case Plow Works Company, of Delaware, and has received in payment therefor certain of the full paid first preferred, second preferred and common, no par value, shares of stock of said company which are now owned by this company and held in its treasury; and

Whereas, this company has received a written offer from W. G. Souders & Company, a corporation organized under the laws of the State of Maine, to

purchase eight thousand seven hundred and fifty (8,750) shares of said first preferred stock at $87.50 cash per share, and for fifty-six hundred (5,600) shares of said second preferred stock at $87.50 cash per share, said payments, however, to include and cover and pay for fifteen thousand three hundred and fifteen (15,315) shares of the said common, no par value stock; and

Whereas it is the sense of this meeting that it is for the best interests of this company to accept said offer of said W. G. Souders & Co.;

Now Therefore Be It Resolved, that said offer of the said W. G. Souders & Company be and is hereby accepted, and the officers of this company be and they hereby are authorized, instructed and directed to do everything reasonably necessary and proper to carry out, bring about or perfect said sale and transfer.

Pursuant to the above resolutions, the Tractor Co. and the Plow Works transferred all of their assets, without liabilities, to the Plow Works Co. as of July 1, 1919. No other assets were acquired by the new company, it having been organized for the express purpose of continuing the business of the two old companies.

The stock of the newly created J. I. Case Plow Works Co. was divided among the taxpayer corporations as follows:

| Stock. | Shares. | Tractor Co. | Plow Works. |
|---|---|---|---|
| First preferred | 35,000 | 8,750 | 26,250 |
| Second preferred | 35,000 | 8,750 | 26,250 |
| Common, no par | 125,000 | 31,250 | 93,750 |

Of the shares received by the Tractor Co. all of the first preferred, 5,600 shares of the second preferred, and 15,315 shares of the common were sold to Souders & Co., and 3,150 shares second preferred and 15,935 shares common were retained; of those received by the Plow Works all of the first preferred, 16,900 shares second preferred, and 45,935 shares common were sold to Souders & Co., and 9,350 shares second preferred and 47,815 shares common were retained. Both taxpayer corporations received payment in 1919 for the shares of stock turned over to Souders & Co., the amount received by the Tractor Co. being $1,255,625, and the amount received by the Plow Works $3,775,625.

13. The Tractor Co. on July 1, 1919, owned assets which it carried on its books as costing $1,417,983.42, arrived at as follows:

| Kind of asset. | Book balance. | Reserves against assets. | Net book value. |
|---|---|---|---|
| Original patents, drawings, and designs | $650,000.00 | $200,000.00 | $450,000.00 |
| Deferred development | 140,972.44 | 50,000.00 | 90,972.44 |
| Accounts receivable | 17,662.19 | 4,321.78 | 13,340.41 |
| Liberty bonds | 8,582.36 | | 8,582.36 |
| Cash | 30,441.96 | | 30,441.96 |
| Machinery and equipment | 606,605.30 | 184,815.08 | 421,790.22 |
| Deferred charges | 9,442.21 | | 9,442.21 |
| Inventories | 597,047.57 | | 597,047.57 |
| | 2,060,754.03 | 439,136.86 | 1,621,617.17 |

Net book value of assets_____ $1, 621, 617. 17
Add:
    Depreciation on patents for 1913, 1914, and 1915, not charged
        to expense but to " Deferred development "_____          9, 375. 00
                                                                        1, 630, 992. 17
Deduct:
    Deferred development taken as a loss in 1919___ $100, 347. 44
    Appreciation of machinery and equipment_____ 103, 718. 69
    Adjustment for depreciation, etc_____ 8, 942. 62
                                                  213, 008. 75

    Cost of assets sold_____ 1, 417, 983. 42

14. The J. I. Case Plow Works on July 1, 1919, owned assets which it carried on its books at $4,271,055.08, arrived at as follows:

| Kind of asset. | Book balance. | Reserves against assets. | Net book value. |
|---|---|---|---|
| Cash | $584, 664. 29 | | $584, 664. 29 |
| Notes and accounts receivable | 649, 418. 09 | $45, 810. 35 | 603, 607. 74 |
| Inventories | 2, 435, 555. 74 | | 2, 435, 555. 74 |
| Liberty bonds and war saving stamps | 101, 997. 43 | | 101, 997. 43 |
| Stock of domestic corporation | 3, 000. 00 | | 3, 000. 00 |
| Deferred charges | 46, 685. 78 | | 46, 685. 78 |
| Land and buildings | 623, 763. 43 | 102, 412. 93 | 521, 350. 50 |
| Machinery and equipment | 658, 179. 16 | 441, 428. 59 | 216, 750. 57 |
| Appreciation of fixed assets | 1, 031, 456. 24 | | 1, 031, 456. 24 |
| | 6, 134, 720. 16 | 589, 651. 87 | 5, 545, 068. 29 |

Net book value of assets_____ $5. 545, 068. 29
Add:
    Excess of cost of machinery and equipment over value at
        March 1, 1913_____          401. 04
                                                    5, 545, 469. 33
Deduct:
    Appreciation of fixed assets_____ $1, 031, 456. 24
    Inventory adjustment not on books taken as
        a loss in 1920_____ 163, 105. 77
    Increase in depreciation reserve_____ 79, 852. 24
                                              1, 274, 414. 25

    Cost, plus appreciation prior to March 1, 1913, of assets
        sold_____ 4, 271, 055. 08

15. Upon the organization of the J. I. Case Plow Works Co. and the receipt by it of the assets from the Tractor Co. and the Plow Works, the book value of the fixed assets received was written up in order that the balance sheet might reflect a book value for both classes of preferred stock and the no par value common stock as follows:

| Kind of asset. | Book value. | | As taken over by J. I. Case Plow Works Co. |
| --- | --- | --- | --- |
| | Wallis Tractor Co. | J. I. Case Plow Works. | |
| Inventories | $597,047.57 | $2,435,555.74 | $3,032,603.31 |
| Notes and accounts receivable, net | 13,340.41 | 603,607.74 | 616,948.15 |
| U. S. Liberty Bonds | 8,582.36 | 101,997.43 | 110,579.79 |
| Cash | 30,441.96 | 584,664.29 | 615,106.25 |
| Deferred charges | 9,442.21 | 46,685.78 | 56,127.99 |
| Stock of domestic corporations | | 3,000.00 | |
| Patents, designs, and drawings, net | 450,000.00 | | 650,000.00 |
| Fixed assets (cost less depreciation) | 318,071.53 | 738,101.07 | } 2,191,347.53 |
| Appreciation of fixed assets | 103,718.69 | 1,031,456.24 | |
| Deferred development, net | 90,972.44 | | |
| | 1,621,617.17 | 5,545,068.29 | 7,272,713.02 |

Book value of assets taken over by Plow Works Co_____ $7,272,713.02
First and second preferred stock issued (at par)_____ 7,000,000.00

Balance representing 125,000 shares common stock_____ 272,713.02
Good will added by new company_____ 2,000,000.00

Book value of common stock (125,000 shares) as carried by
  new company _____ 2,272,713.02

Book value per share of common stock after adding apprecia-
  tion of fixed assets and good will amounting to $3.135,174.93__  18.1817

16. As at June 29, 1912, an appraisal of assets of the Plow Works was made by Coats, Burchard & Co., based upon replacement values, the appraisal figures being placed upon the books. These entries resulted in a writing up or appreciation of the assets at that date of $293,403.69. Such appreciation in value having occurred prior to March 1, 1913, the cost of the assets sold to the Plow Works Co., appearing in finding 14 above, reflects such appreciation.

17. The net income of the Plow Works for the fiscal years ended June 30, 1915, to June 30, 1920, as returned by the corporation and as corrected by the Commissioner, was as follows:

| Fiscal year ended. | Net income returned. | Net income corrected. |
| --- | --- | --- |
| June 30, 1915 | [1] $28,886.93 | (?) |
| June 30, 1916 | 104,755.89 | (?) |
| June 30, 1917 | 311,915.68 | $331,053.93 |
| June 30, 1918 | 699,138.34 | 743,336.16 |
| June 30, 1919 | 151,909.11 | 110,172.43 |
| June 30, 1920 | 251,567.92 | 1,069,644.38 |

[1] Loss.

Dividends at the rate of 6 per cent per annum on both the common and preferred stocks were regularly paid in 1917, 1918, and 1919. On December 2, 1919, a dividend in liquidation of $1,200,000 was declared, and on May 11, 1920, the books of account show the pay-

ment of a .further dividend in liquidation of $133,200, although the corporation was legally dissolved in December, 1919.

18. The net income returned by the Tractor Co.. and the net income as corrected by the Commissioner for the calendar years 1915, 1917, 1918, and 1919, was as follows:

| Year. | Net income returned. | Net income corrected. |
|---|---|---|
| 1915 | 1 $21,226. 88 | (?) |
| 1917 | 125, 058. 16 | $146, 835. 36 |
| 1918 | 52, 703. 26 | 363, 570. 11 |
| 1919 | 74, 326. 32 | 859, 268. 47 |

1 Loss

Nothing is in evidence as to the earnings of this company for 1916. In the corrected net income for 1918 there was disallowed a deduction from gross income of $250,000 for obsolescence of drawings, tracings, etc., and for the calendar year 1919 there was added to the gross income returned by the taxpayer $801,413.52, profit on the sale of the assets to the J. I. Case Plow Works Co. No dividends were paid upon the common or preferred stocks of the Tractor Co. from the date of organization to the date of the sale of its assets to the Plow Works Co. A dividend of $300,000 in-liquidation was declared on December 2, 1919. The books of account show the declaration of a further dividend in liquidation of $200,000 on May 11, 1920.

19. The only sales of shares of stock of the Plow Works Co. received by either the Tractor Co. or the Plow Works during the year 1919, besides those sold to Souders & Co., were 1,187 shares of the second preferred stock, accompanied by a like number of no par value shares of common stock given as a bonus, sold to employees of the Plow Works Co. in December, 1919. The sales were made at $90 a share. The purchasers agreed not to sell them during the life of the syndicate. The sales were made in accordance with the agreement existing between Wallis and Souders.

In December, 1920, employees of the Plow Works Co. purchased from Wallis 750 shares of second preferred stock at $59.50 a share.

20. Neither of the taxpayer corporations transacted any business, aside from the liquidation of their outstanding liabilities, after September 11, 1919, and both were dissolved some time in December, 1919.

21. The market quotations of the stock of the J. I. Case Plow Works Co. on the Chicago Stock Exchange from October 25, 1919, to January 3, 1921, were as follows:

| Week. | Common stock. | | First preferred stock. | | Second preferred stock. | |
|---|---|---|---|---|---|---|
| | Number of shares traded. | Price. | Number of shares traded. | Price. | Number of shares traded. | Price. |
| **1919.** | | | | | | |
| Oct. 25–31 | 3,350 | 24–26½ | 660 | 97 | 236 | 98½–98⅝. |
| Nov. 1–7 | 4,255 | 24⅜–27 | 463 | 97–97¼ | 35 | 98½. |
| Nov. 8–14 | 3,575 | 21½–24¾ | 800 | 97–98½ | 125 | 98½. |
| Nov. 15–21 | 1,340 | 20¾–22 | 50 | 97–97⅞ | | |
| Nov. 22–28 | 775 | 20½–21¾ | 100 | 97 | | |
| Nov. 29–Dec. 5 | 2,255 | 20½–21¼ | 10 | 97 | | |
| Dec. 6–12 | 1,830 | 20½–20¾ | 395 | 97 | | |
| Dec. 13–19 | 1,335 | 20½–21½ | | | 160 | 98½. |
| Dec. 20–26 | 325 | 20½–21¾ | | | | |
| Dec. 27–Jan. 2 | 3,445 | 21½–24½ | | | 50 | 98½ |
| **1920.** | | | | | | |
| Jan. 3–9 | 4,845 | 23–24½ | | | 25 | 98½. |
| Jan. 10–16 | 1,595 | 22¼–24 | 50 | 96 | 440 | 98½. |
| Jan. 17–23 | 1,508 | 20½–22¼ | 931 | 95–97⅛ | 60 | 98–98½. |
| Jan. 24–30 | 765 | 20⅝–21¾ | 432 | 97–97⅞ | 10 | 98½. |
| Jan. 31–Feb. 6 | 2,345 | 16½–20¾ | 349 | 97 | 200 | 98½. |
| Feb. 7–13 | 240 | 16–18½ | 200 | 97 | 450 | 98½–98⅝. |
| Feb. 14–20 | 617 | 17–18 | 30 | 97 | 675 | 98¼–98½. |
| Feb. 21–27 | 2,302 | 15–17½ | 466 | 97 | 560 | 77⅞–96¼. |
| Feb. 28–Mar. 5 | 400 | 15½–17½ | 1,204 | 93–97 | 340 | 73–77½. |
| Mar. 6–12 | 945 | 15–16½ | | | 290 | 73–75. |
| Mar. 13–19 | 9,550 | 16½–20¾ | 20 | 90–90½ | 880 | 73–75. |
| Mar. 20–26 | 8,850 | 18½–22 | 40 | 90¾–91 | 1,265 | 75½–79½ |
| Mar. 27–Apr. 1 | 3,275 | 19–21⅜ | 10 | 90¾ | 90 | 78. |
| Apr. 5–9 | 7,500 | 20–22¾ | 95 | 90–91 | 110 | 75–78. |
| Apr. 10–16 | 10,805 | 22½–24½ | | | 335 | 75¼–77½. |
| Apr. 17–23 | 6,350 | 19¼–22¾ | 50 | 90 | | |
| Apr. 24–30 | 3,500 | 17½–22 | | | | |
| May 3–8 | 1,060 | 17¼–19 | 18 | 88 | 20 | 71. |
| May 10–15 | 220 | 17–18½ | | 87–88 bid | 71 | 68–71. |
| May 17–22 | 2,877 | 14–18 | | 87 bid | 60 | 68–69. |
| May 24–28 | 1,115 | 14½–16 | 100 | 87 | 62 | 68. |
| June 1–5 | 278 | 16–16½ | 3 | 87 | | 68 bid. |
| June 7–12 | 670 | 15–16½ | | 85–87 bid | | 68 bid. |
| June 14–19 | 735 | 16–18½ | | 85 bid | | 65–68 bid. |
| June 21–26 | 180 | 16–18 | | 85 bid | | 65 bid. |
| June 28–July 2 | 2,280 | 14–16 | | 83–85 bid | | 65 bid. |
| July 6–10 | 1,550 | 14–14½ | | 83 bid | | 65 bid. |
| July 12–17 | 470 | 12½–14 | | 83 bid | | 65 bid. |
| July 19–24 | 800 | 11–12½ | | No bids | 50 | 65 bid. |
| July 26–31 | 690 | 10–11 | | No bids | | No bids. |
| Oct. 1 | | 9 bid | | 80 bid | | 60 bid. |
| Nov. 1 | | 9¾ bid | | 80 bid | | 60 bid. |
| Dec. 1 | | 6½ bid | | No bid; 85 asked | | 70 asked. |
| Jan. 3, 1921 | | 5½ bid | | 75 bid | | 50 asked. |

22. In making his determination of the profit realized by the Tractor Co. upon the sale of its assets, without liabilities, to the new company, the Commissioner computed the value of the first and second preferred stock sold to Souders & Co. at $87.50 a share and the value of each share of second preferred stock and no par value common stock retained by the Tractor Co. at $71.216544 and $15.906233, respectively. His computation follows:

3,150 shares second preferred at $71.216544_____ $224,332.11
15,935 shares common at $15.906233_____ 253,465.82
                                                                    _____
                                                                  . 477,797.93

The amount received for the stock from Souders & Co. was as follows:

8,750 shares first preferred at $87.50_____ $765,625.00
5,600 shares second preferred at $87.50_____ 490,000.00
                                                    _____
                                                             1,255,625.00

Total value received as computed by Commissioner_____ 1,733,422.93
Net cost of assets of taxpayer as computed by Commissioner_____ 932,009.41
                                                                   _____
    Profit on sale of assets to Plow Works Co_____ 801,413.52

23. The depreciated cost of the assets of the Tractor Co. sold to the Plow Works Co. in 1919 was $1,127,214.22, and the depreciated cost of the assets of the Plow Works sold to the Plow Works Co. during the same year was $4,271,055.08.

## OPINION.

SMITH: These appeals come before this Board upon numerous assignments of error. In support of some of them the taxpayers have offered no evidence. At the hearing counsel for the Commissioner was permitted to amend his answer to the appeal of the Tractor Co. by alleging that the Commissioner erred in the computation of the invested capital for the year 1918 and that the correct invested capital for that year was $184,375 less than the amount shown on page 3 of the deficiency letter dated October 28, 1924. The net result of the amendment was to increase the deficiency in tax for the year 1918 in the amount of $12,980.

The assignments of error will be taken up in order.

1. The Tractor Co. alleges that the Commissioner erred in finding that the actual cash value of certain patents, patent applications, drawings, blue prints, tracings, etc., acquired by it in exchange for $650,000 par value of its capital stock, was $50,000 instead of $650,000. In support of his determination the Commissioner contends that, by the agreement made with Wallis, Conger bound himself to transfer his property for one-third of the $650,000 par value of capital stock of the Tractor Co. ostensibly issued therefor and $15,000 in cash; that the other two-thirds of the $650,000 capital stock were to go to Wallis upon his promise to pay in to the corporation not over $100,000 for a like amount of the preferred stock as called for by the corporation; and that, for a promise to pay $100,000 for preferred stock, Wallis got twice as large an interest in the corporation as Conger got for the patents, drawings, blue prints, etc.

On behalf of the Tractor Co. it is contended that the actual cash value of the patents, drawings, etc., at the date of acquisition was $650,000; that the board of directors of the Tractor Co. issued

$650,000 par value of its capital stock for the assets, and that, under the provisions of the statutes of the State of Wisconsin, shares of stock may not be issued except " in consideration of money or of labor or property estimated at its true money value." (Section 182.06.) It is claimed that, in the absence of fraud, this is con-clusive that the cash value of property paid in to a corporation organized under the laws of the State of Wisconsin is worth at least the par value of the shares of stock issued therefor. In sup-port of this proposition the taxpayer cites *National Bank of Mer-rill* v. *Illinois & Wisconsin Electric Co.*, 101 Wis. 247; 77 N. W. 185; and *State ex rel. Van Dyke* v. *Cary*, (Wis.) 191 N. W. 546.

The Revenue Act of 1918 provides that in computing invested capital there shall be included " the actual cash value of tangible property " paid in for shares of stock (section 326 (a) (2)) ; also, that the basis for determining gain or loss sustained from the sale or other disposition of property shall be, in the case of property ac-quired before March 1, 1913, " the fair market price or value of such property as of that date." Section 202 (a) (1). The basis for de-termining deductible depreciation and obsolescence upon such prop-erty is cost, or, in the case of property acquired before March 1, 1913, the value on that date. Article 161, Regulations 45. Such " actual cash value " or " fair market price or value " must be deter-mined in any appeal coming before this Board upon the basis of the evidence of record. The Board will look through mere form to de-termine the substance of the transaction. *Appeal of W. C. Bradley*, 1 B. T. A. 111. The par value of the shares of stock issued by a corporation in payment for property is not conclusive evidence as to the actual cash value or fair market price or value of that property. *Appeal of The Hotel de France Co.*, 1 B. T. A. 28; *Appeal of Dwight & Lloyd Sintering Co.*, 1 B. T. A. 179.

The evidence in the instant appeal is to the effect that hundreds of thousands of dollars had been spent in developing the Conger tractor to the point of perfection which it had attained at the time that it was acquired by the Tractor Co. The original inventor was a man by the name of Corbett. Conger acquired it from Corbett's estate, and his chief engineer testified that Conger had spent several hun-dred thousand dollars upon it under his direction and supervision. The tractor was unlike any other on the market, and in the opinion of Wallis and his engineers had great possibilities. Many of the good points of the machine were protected either by patents or patent applications. The J. I. Case Plow Works had spent a large amount of money in perfecting gang plows to be tractor drawn. Owing to the increasing practice of manufacturers of tractors to manufacture gang plows to be sold with the tractors, the Plow Works found this branch of its business dwindling. The Plow Works

was in the market for a tractor. Its engineers and experimental men reported to Wallis that in their opinion it would cost from $500,000 to $1,000,000 to perfect a tractor to the point that the Conger tractor was perfected in 1912. Conger wanted a million dollars for the patents, drawings, etc., connected with his tractor.

We can not doubt, in the light of all the evidence of record, that such patents, drawings, blue prints, etc., had a large cash value. We think that the value was in excess of the $50,000 found by the Commissioner. We are of the opinion, however, that the value was not as much as $650,000. Although $650,000 par value of capital stock was issued for the assets and that amount of the capital stock was received by Conger, it is to be noted that he was to hold it only momentarily. All that Conger actually received for the assets for his own use and enjoyment was $180,000 par value of common stock, $35,000 par value of preferred stock, and $15,000 cash. The Tractor Co. claims that a part of the consideration was the promise of Wallis to finance the corporation, and that in pursuance of such promise he risked his fortune. To our minds this argument is not persuasive. So far as the evidence shows, Wallis was reimbursed for every dollar he advanced to the corporation in financing it. We are of the opinion, from a consideration of all of the evidence, that the actual cash value of the patents, drawings, blue prints, etc., paid by Conger to the Tractor Co. was $230,000, and no more.

2. The second allegation of error is to the effect that the Commissioner erred in refusing to allow a deduction from the Tractor Co.'s gross income for 1918 of $250,000 on account of obsolescence of the drawings, blue prints, tracings, etc. It appears that $200,000 of this amount was charged against the book value of the original patents, drawings, blue prints, etc., acquired from Conger, and that $50,000 was charged against an account known as " Deferred development." In this amount was recorded the cost of making drawings, blue prints, tracings, etc., connected with " Model B." In the record of the appeal the tractor acquired from Conger is designated as " Model A." The Commissioner has disallowed the deduction of $250,000, claimed as a deduction for obsolescence, on the ground that the Tractor Co. " did not manufacture the Conger tractor." It is true that the " Model A " tractor was not manufactured by the Tractor Co. The " Model B " tractor was, however, manufactured in accordance with the designs covered by the patents and patent applications and in accordance with the blue prints, drawings, and tracings acquired from Conger. The stipulated facts also show that " Model C " and " Model D," which were made in 1914, 1915, and 1916, respectively, followed closely the original drawings, blue prints, tracings, and data, and also embodied many of the patented features acquired from Conger. In 1918 the Tractor

Co. came to the conclusion that its financial statements, as a basis for bank credit, were inaccurate by reason of the fact that its drawings, tracings, etc., acquired from Conger were carried at their original book cost. After careful consultation with its engineer and drafting force, it came to the conclusion that the drawings, blue prints, etc., acquired from Conger could then be destroyed, and also that most of the drawings used in the manufacture of "Model B" could also be destroyed. They were then destroyed and their book cost was reduced as indicated above.

We are of the opinion that the deduction of $50,000, representing obsolescence of the drawings made by the taxpayer and used in connection with "Model B," was proper. We have found, however, that the actual cash value of the patents, drawings, blue prints, etc., acquired from Conger was only $230,000, and not $650,000, as claimed by the Tractor Co. In other words, we have found that the actual cash value was only 35.3846 per cent of the book value. We are, therefore, of the opinion that, in determining the amount of obsolescence deductible from gross income for the year 1918, the $200,000 claimed deduction should be reduced in like ratio and that the taxpayer should be allowed a deduction of only $70,769.20 for obsolescence of the original drawings, blue prints, etc., acquired from Conger. The total amount of obsolescence deductible from gross income for 1918 in respect of drawings is $120,769.20 instead of $250,000, as claimed.

3. The third allegation of error is that the sale of the assets of the Tractor Co. and of the Plow Works for all the shares of the capital stock of the Plow Works Co. in 1919 was not such a transaction as could in and of itself have resulted in the realization of income subject to tax. The Commissioner contends that this is a transaction falling under the provisions of section 202(b) of the Revenue Act of 1918, and that, to the extent that the fair market value of the shares of stock received by the taxpayers from the Delaware corporation exceeded the cost to them of the assets transferred, such excess constitutes taxable income; that the question whether the taxpayer received income from the transaction is settled by the decision of the United States Supreme Court in *United States* v. *Phellis*, 257 U. S. 156. The taxpayers, on the other hand, claim that the decision of that court in *Weiss* v. *Stearn*, 265 U. S. 242, and a line of cases holding that substance and not form shall govern in determining whether income is derived from a given transaction, requires a determination of the issue in favor of the taxpayers.

Since the hearing of these appeals the Supreme Court has rendered a decision in the case of *Marr* v. *United States*, 268 U. S. 536, which, in our opinion, supports the Commissioner's contention. The facts in that case are that, prior to March 1, 1913, the appel-

lant and his wife purchased 339 shares of the preferred and 425 shares of the common stock of the General Motors Co. of New Jersey for $76,400. In 1916 they received in exchange for this stock 451 shares of the preferred and 2,125 shares of the common stock of the General Motors Corporation of Deleware, which (including a small cash payment) had an aggregate market value of $400,866.57. The difference between the cost of their stock in the New Jersey corporation and the value of the stock in the Delaware corporation was $324,466.57. The court held that this amount constituted taxable income of the appellants for the year 1916. In the course of its opinion the court stated:

In the case at bar, the new corporation is essentially different from the old. A corporation organized under the laws of Delaware does not have the same rights and powers as one organized under the laws of New Jersey. Because of those inherent differences in rights and powers, both the preferred and the common stock of the old corporation is an essentially different thing from stock of the same general kind in the new. But there are also adventitious differences, substantially in character. A 6 per cent. non-voting preferred stock is an essentially different thing from a 7 per cent. voting preferred stock. A common stock subject to the priority of $20,000,000 preferred and a $1,200,000 annual dividend charge is an essentially different thing from a common stock subject only to $15,000,000 preferred and a $1,050,000 annual dividend charge. The case at bar is not one in which after the distribution the stockholders have the same proportional interest of the same kind in essentially the same corporation.

Although the Revenue Act of 1916 was under consideration by the Supreme Court in that case, the provisions of the Revenue Act of 1918, so far as they bear upon the facts in issue, are not materially different, and the Board is of the opinion that the court's reasoning is equally applicable to the Revenue Act of 1918. In the appeals at bar the taxpayers sold assets, without liabilities, for shares of stock of a corporation organized in a different State. The assets of the new corporation were materially different from the assets of either of the taxpayer corporations, separately considered, and the liabilities of the stockholders were also materially different. The taxpayers exchanged assets of one character for assets of an entirely different character, and they are liable to income tax in respect of any profit which may have been realized by them upon the transaction based upon the difference between the cost or fair market value at March 1, 1913, if greater, of those assets and the fair market value, if any, of the shares of stock of the new corporation received in exchange.

4. What was the "fair market value" of the shares of stock of the Plow Works Co. received by the taxpayer corporations in exchange for their assets without liabilities? The taxpayers contend that they had no fair market value within the meaning of section

202 (b) of the Revenue Act of 1918; that the shares of stock were received under an agreement with the taxpayers' bankers by which Souders & Co. was to purchase a portion of them; that the balance of the second preferred stock not purchased was to be retained for an indefinite period and the balance of the no par value common stock not taken was to be retained for a period of at least two years; that, under such circumstances, it can not be said that the shares of stock received had a " fair market value " at the date of receipt, for the reason that those not taken by Souders & Co. could not then be sold by the recipients. The Commissioner contends, on the other hand, that the shares of stock received had a fair market value; that the shares were actively dealt in on the Chicago Stock Exchange from some time in October, 1919, and that the stock quotations from the date the shares of stock were first listed on the exchange to the end of 1920 afford a basis for the computation of the fair market value of the total number of shares received; that the restriction placed upon the sale of the shares of stock by Souders & Co. is no absolute bar to a determination of the fair market value of them.

The language of section 202 (b) of the Revenue Act of 1918 applicable to this situation is as follows:

When property is exchanged for other property, the property received in exchange shall for the purpose of determining gain or loss be treated as the equivalent of cash to the amount of its fair market value, if any; * * *

The question of what constitutes the " fair market price or value " of shares of stock as of March 1, 1913, within the contemplation of the Revenue Act of 1916, was before the Circuit Court of Appeals for the Third Circuit in the case of *Walter* v. *Duffy*, 287 Fed. 41. In the course of its opinion the court stated:

[3] Now, what is the market price? What is the fair market price of the statute? We say " fair," since every word used by Congress must be given due effect in the construction of this widely applicable statute, for obviously, while a stock might be bought and sold—and so marketed—and might thus be said to evidence some market price, yet it is obvious that Congress by the addition of the words " fair market price," certainly meant that not only must the market price be ascertained by sales, but that sales so made, the circumstances under which they were made, the subject-matter of the sales, all the attendant circumstances, were to be considered to determine whether such sales served to evidence not alone a market sale, but the fair price which Congress said should be the statutory start or base from which subsequent " gain derived " should be determined.

[4] We start, then, with the fact that we are here dealing with the existence of a market, and a market price evidenced by sales in such market; so that our first and basic inquiry is whether there actually was a market for the sale of this insurance stock. Now, market implies the existence of supply and demand, for without the existence of either factor no market value is shown. Standing alone, offers to sell, with no takers, or offers to buy, with no sellers,

show no such concurring willing action of buyer and seller as is involved where a market is made by buyers and sellers who by their respective sales and purchases make a market price which the law takes as evidence of value. * * *

In a more recent case before the United States District Court for the Western District of Pennsylvania, *Phillips* v. *United States*, 12 Fed. (2d) 598, the question presented was the fair market value as of March 1, 1913, of certain shares of stock of the Pure Oil Co. In the course of its opinion the court stated:

It is well settled that the fair market price or value of the property as of March 1, 1913, is a question of fact under all the circumstances of the case. No method of determining this value can be stated which will adequately meet all circumstances. The stock sales made from time to time are to be considered, together with the nature and extent of the sales, and the circumstances under which they were made, hence forced sales, or sales of small lots, may often be no real indication of the value. The test is the fair market value. This may be defined to be the value of the property in money as between one who wishes to purchase and one who wishes to sell; the price at which a seller willing to sell at a fair price and a buyer willing to buy at a fair price, both having reasonable knowledge of the facts. Prior to 1924, it appearing that the Treasury Department in valuing the stock of close corporations, had given insufficient weight to the value of the assets and too great weight to forced or isolated sales of comparatively small blocks, there were inserted in the Revenue Act of 1924 these words: "In determining the fair market value of stock in a corporation as of March 1, 1913, due regard shall be given to the fair market value of the assets of the corporation as of that date." * * *

In the instant appeal the taxpayers, at the time they received the shares of stock from the Plow Works Co., had an agreement with Souders & Co. by which it was to purchase all of the first preferred stock of the new company, 35.714 per cent of the second preferred stock, and between 48 and 49 per cent of the common stock. Souders & Co. were to pay $87.50 per share for each share of first and second preferred stock purchased, each share to be accompanied by one share of common stock as a bonus. One of the conditions upon which Souders & Co. made the purchase was that the second preferred stock not purchased was to be held by the taxpayer corporations for a period of approximately six months until Souders & Co. and their associates had disposed of the stock acquired by them, and that the common stock retained was to be held for a period of two years. Wallis was to continue to serve as president of the corporations for the two-year period. In view of these facts, the price paid by Souders & Co. for the shares taken is no indication of the fair market value of such shares. .

The Commissioner determined the profit made by each taxpayer corporation from the sale of its assets, without liabilities, to the Plow Works Co. upon the basis that the shares of stock sold to Souders & Co. had a fair market value equal to the amount paid

for them by Souders & Co. and that each share of second preferred and common no par value stock retained had a fair market value of $71.216544 and $15.906233, respectively. The basis for the determination of the value of each share of second preferred and no par value common stock retained is the prices at which these classes of stock were sold on the Chicago Stock Exchange from the time the shares were listed in October, 1919, to approximately December 31, 1920. It is to be noted, however, that from the time the shares were listed until February 27, 1920, the prices of the shares were controlled by the syndicate. The members of the syndicate had agreed among themselves not to sell any shares of stock on the exchange below a given price. The syndicate purchased all shares of stock offered below a given price to support the market. In all such instances the names of the sellers were taken, and if any member of the syndicate sold shares at less than the price agreed upon, such member was required immediately to repurchase the shares. A few members violated their agreements with the other members and were immediately required to repurchase the stock. Immediately after the syndicate was dissolved the prices of the shares broke badly, and within a very short time there were practically no sales of the shares on the exchange. Clearly, the prices during the syndicate period were not fair market prices, and it was the testimony of witnesses that it would have been practically impossible to sell as much as 1,000 shares of the stock after the syndicate was dissolved at anything like market quotations. It may also be noted that one or two pools were formed in 1920 to keep up the prices of the shares on the exchange, and that the subscribers to the pools lost heavily. In the light of this evidence, we are of the opinion that the quotations for the shares upon the Chicago Stock Exchange afford little basis for the determination of the fair market value of the shares at the time those shares were received by the taxpayer corporations. We therefore reject the method used by the Commissioner for determining the value of the shares at the date of receipt by the taxpayer corporations.

If the quoted prices for the shares do not afford a basis for determining fair market value, may that value be determined in any other way? The shares of stock of the Plow Works Co. were received by the taxpayer corporations in exchange for their assets, without liabilities. May it be assumed that the shares of stock had the same fair market value as the assets for which they were substituted? If so, what was the fair market value of the assets? The book value of the fixed assets of the Tractor Co. were appreciated as of June 30 or July 1, 1919, to the extent of $103,718.69, and those of the Plow Works to the extent of $1,031,456.24. The appreciation of the Plow Works' assets was in addition to an appreciation of those assets made

in 1912 of $293,403.69. The appreciation made in 1919 in the case of each company was upon the basis of valuations made by Arthur Young & Co., certified public accountants. Did such valuations have any reference to the fair market value of the assets? We are of the opinion that they did not. In the case of the Tractor Co., the original patents, drawings, etc., relating to the Conger tractor acquired from Conger in 1912, were written up on the books of account to the extent of $200,000, or from $450,000 to $650,000. We have found, however, that the depreciated cost of those assets as of June 30, 1919, was only $159,230.80 ($230,000 value at the date of acquisition less $70,769.20 obsolescence in 1918), and we are of the opinion that the fair market value of those assets at that date was not in excess of that amount. After appreciating the value of the assets of the Tractor Co. to the extent of $594,487.89, the accounting firm found that their value was $1,730,644.73. We are of the opinion that the true market value of the assets was more nearly represented by the books of account before the appreciation was made. We have found that the depreciated cost of the assets was $1,127,214.22, and we are of the opinion that that was their fair market value on June 30, 1919. The Commissioner and the taxpayer have stipulated that $4,271,055.08 was the depreciated cost (enhanced by appreciation in value occurring prior to March 1, 1913) of the assets of the Plow Works transferred to the new company. We think that the fair market value of the assets of the Tractor Co. and of the Plow Works transferred to the Plow Works Co. for all of its shares of stock was the sum of these two amounts, or $5,398,269.30, and that that amount represents the fair market value of the shares of stock of the Plow Works Co. received in exchange.

It will be noted from the findings of fact that the assets of the two taxpayer corporations were sold to the Plow Works Co. for 35,000 shares first preferred, 35,000 shares second preferred, and 125,000 shares common stock of the new company. In the absence of any stipulation by the parties as to the allocation of value to the several classes of stock received, the Board must determine the value from the evidence submitted. As the result of a number of computations made, the Board reaches the conclusion that the fair market value of each share of preferred stock was $69.40631957 and of each share of common stock $4.31861. The Tractor Co. received 17,500 shares of preferred stock and 31,250 shares of common stock; the Plow Works received 52,500 shares of preferred stock and 93,750 shares of common stock. The fair market value of the shares of stock received by the Tractor Co. was $1,349,567.15 and that of the shares received by the Plow Works $4,048,701.94. Since the depreciated cost of the assets sold by each of the taxpayer corporations for the shares of stock received was $1,127,214.22 and $4,271,055.08, respec-

tively, the Tractor Co. realized a profit from this transaction of $222,352.14 and the Plow Works a loss of $222,353.14.

In reality the sales of assets, without liabilities, by the two corporations to the Plow Works Co. for certain shares of stock of the Plow Works Co., and the sale to Souders & Co. by each of the taxpayer corporations of a portion of the shares of stock of the Plow Works Co. received, were separate transactions. The basis for the computation of gain or loss upon the sale of shares of stock to Souders & Co. is the " cost thereof." Section 202 (a) (2), Revenue Act of 1918. The sale by each taxpayer corporation of its assets, without liabilities, to the Plow Works Co. constituted a closed and completed transaction. The fair market value of each share of preferred stock received was $69.406319 and of each share of common stock $4.31861. These figures represent the " cost " of each share of stock of the Plow Works Co. received by the taxpayer corporations, and are the basis for computing gains and losses upon the sales of those shares. The Tractor Co. sold to Souders & Co. 8,750 shares of first preferred, 6,900 shares of second preferred, and 15,315 shares of common stock of the Plow Works Co., receiving in exchange therefor $1,255,625. The shares of stock sold cost the Tractor Co., upon the basis of the values above stated, $1,062,120.19, and the profit realized upon the sale to Souders & Co. was $193,504.81. The profit realized by the Plow Works from the sale of 26,250 shares of first preferred, 16,900 shares of second preferred, and 45,935 shares of no par value common stock of the Plow Works Co., computed in a similar manner, was $582,366.98.

The net result of the refinancing operations carried out by the Tractor Co. during the calendar year 1919 was a profit on the sale of its assets, without liabilities, to the Plow Works Co. of $222,352.93, and a further profit upon the sale to Souders & Co. of a portion of the shares received of $193,504.81, or a total profit for the year in respect of the transactions of $415,857.74. The result of similar transactions of the Plow Works was a loss upon the first transaction of $222,353.65 and a profit upon the second transaction, the sale to Souders & Co., of $582,366.98, or a net profit on both transactions of $360,013.33. The Plow Works received a further profit during its fiscal year ended June 30, 1920, from the sale of 1,187 shares of its second preferred stock, accompanied by a bonus of 1,187 shares of common stock, at $90 per unit. The profit on each unit was $16.275065, and the total profit from the sale of 1,187 units was $19,318.51.

5. The taxpayers request relief from alleged excessive taxes, for the years 1918 and 1919, under section 328 of the Revenue Act of 1918. ` No evidence of comparatives was submitted by the taxpayer corporations. We are of the opinion that the net incomes of the

Tractor Co. for 1919 and of the Plow Works for the fiscal year ended June 30, 1920, were abnormal by reason of profits realized from the sale of capital assets, and that they should have any relief to which they may be entitled under section 328 of the Act. The determination of relief made by the Commissioner will be final. *Appeal of H. T. Cushman Mfg. Co.*, 2 B. T. A. 39.

*Order of redetermination will be entered on 30 days' notice, under Rule 50.*