E. F. SIMMS, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 19175, 19791. Promulgated August 11, 1933.

*Fred R. Angevine, Esq.*, for the petitioner.

*Elden McFarland, Esq.*, and *Arthur Clark, Esq.*, for the respondent.

BEFORE MARQUETTE AND SEAWELL.

994

998

1000

1002

1004

1008

OPINION.

MARQUETTE: The major issue presented in these proceedings is what profit, if any, the petitioner realized through the transfer of certain oil leases on June 19, 1919, to a corporation for its entire capital stock, and the exchange of the foregoing stock on June 30, 1919, for stock in a second corporation. Stated briefly, the controversy arises on the basis of the following facts: During 1917,

1918 and the early part of 1919, the petitioner acquired oil leases on approximately 421,000 acres of land at a cost of $972,012.94. (The petitioner had as an associate, Henry Oliver, who furnished $300,000 of the purchase price, but for the purpose of a discussion of the important principles involved the Oliver interest will be disregarded.) On June 19, 1919, the Simms Oil Co. (a Texas corporation) was formed, to which the petitioner transferred the oil leases in consideration for the issuance to him of its entire capital stock of a par value of $10,000,000. Prior to that time negotiations had been in progress between the petitioner and certain New York bankers and capitalists looking to the formation of a corporation for the exploitation and development of the leases, and to that end agreements were entered into on May 29, 1919, and June 10, 1919. On June 25, 1919, a further agreement was entered into under which the Simms Petroleum Co. (a Delaware corporation) was formed on June 27, 1919, with an authorized capital stock of 500,000 shares (no par value). Pursuant to the agreement of June 25, 1919, the petitioner on June 30, 1919, transferred the entire capital stock of the Simms Oil Co. to the Simms Petroleum Co. in consideration for the issuance to him of 280,990 shares of its capital stock. In accordance with the same agreement, the bankers formed a syndicate which agreed to purchase 144,000 shares of the stock of the Simms Petroleum Co. at $25 per share. The syndicate immediately sold the stock to or through syndicate participants at $31 per share and paid $3,600,000 in cash to the Simms Petroleum Co. Ten shares were issued as qualifying shares and the remaining shares, 75,000, were not issued at that time. Of the 280,990 shares received by the petitioner, 56,000 shares were turned over by him to Harry Bronner, partly in consideration for his services in forming the corporation, thus reducing the number of shares held by him to 224,990. Of the foregoing shares, 50,000 belonged to Henry Oliver on account of his contribution of $300,000 towards the acquisition of the leases, leaving 174,990 shares in the hands of the petitioner. In other words, to state the matter very simply, from 1917 to 1919 the petitioner expended $672,012.94 in the acquisition of oil leases and at the conclusion of the transaction or transactions outlined above he had in place of the leases 174,990 shares of stock of the Simms Petroleum Co., and our question is whether the petitioner realized a gain as a result thereof, and, if so, how much.

The petitioner says that the situation presented is properly divisible for tax purposes into two separate and distinct transactions, namely, first, the transfer of his leases to the Simms Oil Co. in consideration for the issuance to him of its entire capital stock and, second, the exchange of the stock so received for stock of the Simms Petroleum Co. As to this first transaction, the petitioner says that

no taxable gain was realized because the Simms Oil Co. stock received had no fair market value, and as to the second transaction, he also says that no taxable gain was realized because the exchange was in connection with a reorganization or consolidation of the Simms Oil Co. as contemplated by section 202 (b) of the Revenue Act of 1918. The contention of the Commissioner is that the two transfers are to be viewed as one transaction and that accordingly the taxable gain to the petitioner is the difference between the cost of his interest in the leases and the fair market value of the stock of the Simms Petroleum Co., which he says was not less than $25 per share, thus showing a profit of not less than $3,702,737.06. Of course, if both of the transactions set out under the petitioner's contentions are to be considered taxable, or even if the first is non-taxable and the second is taxable, the same result would be reached as if we followed the Commissioner's contention. .

In the first place, are we to view what occurred as constituting one or two transactions? In considering a situation of this nature we start out with the fundamental and well established principles that the question must be decided on the basis of what was done and not the effect of what occurred, and that the design and purpose are not controlling. It is immaterial that the same result might have been accomplished in some other way; even though the practical effect may be the same in either case, the resulting tax liability must be determined upon the basis of the actualities of the situation. *United States* v. *Phellis*, 257 U.S. 156; *Weiss* v. *Stearn*, 265 U.S. 242. The foregoing principles have been consistently followed by the Board. *Anna M. Harkness*, 1 B.T.A. 127; *B. F. Saul*, 4 B.T.A. 639; *William H. Mullins*, 14 B.T.A. 426; and *W. E. Guild*, 19 B.T.A. 1186.

When we view the situation here presented on the basis of the above principles, we can see no answer other than that there were two distinct steps which must be considered separately for tax purposes. Because of the earnestness with which the Commissioner urged the single transaction theory, the large record which was prepared on that basis, and the difference which might result, depending on which of the two theories urged is adopted, we have set out at length the facts which were related to the formation of the two corporations. In our opinion the first transaction was completed when the petitioner exchanged his oil leases for the entire capital stock of the Simms Oil Co. It is undoubtedly true that prior to that time negotiations had been in progress between the petitioner and Knauth, Nachod & Kuhne and others looking to the consummation of that which was not completed until the Simms Petroleum Co. was formed and the commitments which were contained in the agreement to form the Simms Petroleum Co. were carried out, but

it does not necessarily follow that more than one taxable transaction of a separate and distinct tax nature may not have been completed in carrying out the design and purpose of the parties. As heretofore stated, design and purpose are not conclusive, nor would it be argued that, even though several distinct transactions occurred in carrying out some general plan, they should nevertheless necessarily be considered as one inseparable transaction for tax purposes. What here occurred was that prior to June 19, 1919, the petitioner had acquired leases which he owned on that day and he then exchanged the leases for the entire capital stock of the Simms Oil Co. Both the leases and the capital stock were property, and the governing statute (section 202 (b) of the Revenue Act of 1918) provides that " When property is exchanged for other property, the property received in exchange shall for the purpose of determining gain or loss be treated as the equivalent of cash to the amount of its fair market value, if any." Assuming for the purpose of this part of the discussion that the stock received had a fair market value, what basis is there for saying that a completed transaction did not result from which gain or loss would be computed? The Commissioner says it should be so considered for the reason that when the petitioner received the stock he took it subject to the rights of Knauth, Nachod & Kuhne and Harry Bronner as set out in the agreements of May 29, 1919, and June 10, 1919. The agreements referred to set out a plan for organizing and financing a corporation to which the petitioner would transfer his leases or the entire capital stock of a corporation which would own the leases and the bankers would underwrite a part of the corporation's stock and thus furnish a substantial amount of working capital for the corporation. The agreements, however, were subject to the condition that the bankers should first satisfy themselves as to the character of the property and the desirability of forming a corporation, and the bankers and associates were given a specified time within which to elect to proceed thereunder. While we can not accept the petitioner's testimony to the effect that the agreements did not place any obligation on him " to enter into an agreement with them (the bankers and associates)," nor the argument of petitioner's counsel that the agreements should be disregarded because the conditions precedent contained therein had not been performed and therefore the binding contract contemplated had not become operative, we do think the agreements should not be given an effect beyond that plainly intended, namely, that the petitioner obligated himself to carry out its terms within the time specified, provided the other parties evidenced a willingness within that time to go forward with their part of the agreement. Under such circumstances the bankers and their associates could

have withdrawn or proceeded at their election, whereas the petitioner did not have a similar election, but such a situation would not have the effect of invalidating the agreements or cause them to be without force and effect. The same condition exists with respect to many options—in fact, it is quite often true that where a person gives an option he is bound to what might be called inaction during a given period, whereas the other party is left to decide within that period what course he will pursue. The Commissioner does not argue that the conditions named in the agreements had been fulfilled on June 19, 1919, and there is nothing in the record to show that such was the case; what he says is that the agreements of May 29, 1919, and June 10, 1919, were in full force and effect on June 19, 1919, and constituted a valid and subsisting option on that date. We are of opinion that such was the case and that the effect for tax purposes of the exchange of the leases for the stock of Simms Oil Co. on June 19, 1919, should be determined by taking into consideration that such a fact did exist.

But does the fact that a valid and subsisting option was in effect on June 19, 1919, under which the petitioner was bound to do certain things provided the other parties elected to proceed under the agreements, mean that a closed and completed transaction for tax purposes did not result when he exchanged his leases for stock? We think not. Obviously, if the subsequent transactions had never occurred (as well might have been the case), it would not be urged that no gain or loss should be computed merely because when the stock was received the petitioner was under certain conditional obligations as to its disposition. Federal taxes are determined upon an annual basis and all events which occur within a given year must be considered in arriving at the tax liability for such annual period. It so happens here that both of the transactions in controversy occurred within the same year, but the result should not be different if one transaction had occurred in one year and the other within the same length of time but in a subsequent year.

It is urged further that both steps, even though constituting in a sense separate transactions, were part of a general plan and therefore we should regard the substance rather than the form and say that the two transactions were in substance and in fact one inseparable transaction. That substance rather than form should govern in tax matters is of course a well established principle (*Eisner* v. *Macomber*, 252 U.S. 189, and *United States* v. *Phellis*, *supra*), but adherence to that principle does not solve our problem because we still have the difficult task of distinguishing between form and substance. (Cf. *Edward A. Langenbach*, 2 B.T.A. 777). Here, however, we think it clear that in substance as well as in form there were

two separate and distinct transactions, though we think it equally clear that it was carried out pursuant to a general plan wherein the leases owned by the petitioner would be developed and operated and the financing of the venture and the supplying of a high-class board of directors would be taken care of by the bankers. As we said in *William H. Mullins*, 14 B.T.A. 426, "material and essential facts will not be dismissed or set aside as mere matters of form, simply because they are related to and are steps in a comprehensive plan or reorganization or together constitute a method for the attainment of a desired result." See also *Regal Shoe Co.*, 1 B.T.A. 896; *Edward A. Langenbach, supra; Herman Adaskin*, 8 B.T.A. 460; and *J. D. Bigger*, 19 B.T.A. 797. The cases of *Southern Pacific Co.* v. *Lowe*, 247 U.S. 330, and *Gulf Oil Corp.* v. *Lewellyn*, 248 U.S. 71, which the Commissioner cites in support of his position, are so dissimilar as to facts and as to the questions decided that they are of little help in solving the problem before us. Looked at in a substantive manner, we find that the stock which the petitioner received upon the formation of the first corporation was essentially different from that which he received upon the formation of the second corporation. Not only were the corporations incorporated in different states (Texas and Delaware), with entirely different capitalizations, but also the stocks themselves were essentially different in so far as the assets back of them were concerned. The only assets back of the stock of the Simms Oil Co. were the undeveloped oil leases, whereas the Simms Petroleum Co. had not only the entire capital stock of the Simms Oil Co. (which in turn owned the oil leases) but also, through the agreement of June 25, 1919, it in effect came into being with cash (working capital) in the amount of $3,600,000. In other words, the very substance of the transactions themselves as well as their form reveal two separate and distinct transactions within the contemplation of the Revenue Act of 1918. As to the first transaction, we are of opinion that it comes within the portion of section 202 (b) quoted above and that gain or loss should be computed on the difference between the cost of the leases and the fair market value, if any, on June 19, 1919, of the stock of the Simms Oil Co. received in exchange therefor. What the fair market value of such stock was on June 19, 1919, or whether it had a then market value, we shall discuss after we have disposed of the second transaction.

The petitioner's position on the second transaction is that no gain or loss resulted therefrom since what occurred amounted to a "reorganization" within the meaning of that part of section 202 (b) which provides, as an exception to that portion of the section which we held controlling as to the first transaction, that:

\* \* \* when in connection with the reorganization, merger, or consolidation of a corporation a person receives in place of stock or securities owned by him new stock or securities of no greater aggregate par or face value, no gain or loss shall be deemed to occur from the exchange, and the new stock or securities received shall be treated as taking the place of the stock, securities, or property exchanged.

No definition of the term " reorganization " occurs in the Revenue Act of 1918, but in the regulations promulgated thereunder (art. 1567, Regulations 45) the following definition is given:

\* \* \* The term " reorganization," as used in section 202 of the statute, includes cases of corporate readjustment where stockholders exchange their stock for the stock of a holding corporation, provided the holding corporation and the original corporation, in which it holds stock, are so closely related that the two corporations are affiliated as defined in section 240 (b) of the statute and article 633, and are thus required to file consolidated returns. \* \* \*

No suggestion is made by the Commissioner that the foregoing definition does not represent his consistent practice in situations where applicable, nor does he argue that the foregoing definition is an improper interpretation of the term " reorganization " or that it is here inapplicable if we should view what occurred as two transactions. What he says is that there was in effect only one transaction, but that if we should hold there were two transactions to be considered it would be immaterial that we had to value the Simms Oil Co. stock rather than that of Simms Petroleum Co., thus seemingly agreeing by inference that what must be considered to have occurred in the second instance under the " two-transaction " theory was a reorganization within the meaning of the Revenue Act of 1918. Implied approval may be said to have been given to the definition by Congress in enacting section 202 (c) (2) of the Revenue Act of 1921, where a somewhat similar definition of the term " reorganization " is given. Further, the Board, in *George B. Markle, Jr., III*, 10 B.T.A. 763, quoted article 1567 with approval and applied the same in connection with a reorganization there involved. In view of the foregoing, we are of opinion that the term " reorganization " as used in section 202 (b), *supra*, is to be here applied in accordance with the definition in article 1567 of Regulations 45.

When we come to apply the foregoing definition to the facts involved in the second transaction, we find every element present for compliance therewith. In other words, there was a corporate readjustment, the arrangement between the bankers and the petitioner for financing the venture, through which the petitioner as sole stockholder of the Simms Oil Co. exchanged his stock for stock of the holding company, Simms Petroleum Co., and the original company, Simms Oil Co., was so closely related to the holding company, rep-

resented by a complete ownership of the stock of the former by the latter, that the two corporations were affiliated within the meaning of section 240 (b) of the Revenue Act of 1918 and were thus required to file a consolidated return. It therefore follows that a reorganization, within the meaning of the statute, resulted from the exchange and no gain or loss may be computed on account thereof.

With the second transaction eliminated as one giving rise to gain or loss, it remains for us to determine whether gain or loss resulted from the first transaction; that is, we are to determine whether gain or loss arose on account of the exchange by the petitioner on June 19, 1919, of oil leases which cost him and his associate $972,012.94, during 1917, 1918, and 1919, for the entire capital stock less qualifying shares of the Simms Oil Co. The governing statute, section 202 (a), provides in effect that gain or loss under such circumstances would be the difference between the cost of the leases and the fair market value of the stock, if the stock can be said to have had a market value, but if the stock had no fair market value, no gain or loss would arise. The petitioner's position is that the stock in question had no fair market value on June 19, 1919, or in any event, if a fair market value is to be ascribed thereto, such value was some $300,000 less than the cost of the leases and therefore a deductible loss was sustained to that extent. Neither in the determination of the deficiency nor in the presentation of his theory of the case did the Commissioner place a value on the Simms Oil Co. stock *per se*, but instead used and urged a value of $25 per share for the stock of the Simms Petroleum Co. as determinative of the issue before us. What he does say, however, is that it should make but little difference which stock we value since the second exchange followed so closely upon the first that the fair market value of the Simms Petroleum Co. stock would be the best evidence of the value of the Simms Oil Co. stock.

In the first place, let us consider the contention of the petitioner that the Simms Oil Co. stock had no fair market value on June 19, 1919, when received by him. The basis of this contention is that the only assets of the corporation were wildcat or unproven and undeveloped leases of a highly speculative nature, and that the corporation had no earnings, no good will or going-concern value and had not been financed. Further, it was shown that none of the stock was sold or traded in on the market. While the foregoing considerations, separately or collectively, may be persuasive of the lack of a fair market value, they could hardly be said to be conclusive. The value of specific property at a particular time " depends upon the relative intensity of the social desire for it at that time, expressed in the money that it would bring in the market." *Ithaca*

*Trust Co.* v. *United States*, 279 U.S. 151. And a desire for an interest in a venture can not be said to be lacking merely because of its speculative nature. As the court said in *Commissioner* v. *Swenson*, 56 Fed. (2d) 544: "Though a venture is as speculative as a lottery, a chance or interest in it may be readily salable for a substantial sum of money. The law does not forbid the recognition of the proved exchangeable value of an asset because of the speculative nature of it." Admittedly, there was much in the developments surrounding and near the properties in question which might lead to a desire for an interest in the same. The Ranger oil field had been discovered in 1917 and was attracting attention in 1917, 1918 and 1919, and the Desdemona field, another important oil development, was brought in during 1918 and was active during 1919. It is true that many of the bright prospects in these fields were not realized, but it is also true that at June 19, 1919, much remained which might attract an investor in that territory. Lack of earnings or an established good will or operating capital might make the stock less attractive to an investor, or make the market price less, but, as we said in regard to its speculative nature, it would not mean an entire absence of market value. Further, we have evidence of active interest in oil stocks at or about that time, such as the sales of Simms Petroleum Co. stock, which convinces us of the existence of a market for the stock regardless of its speculative nature. The expert testimony offered as to the absence of a market value was based largely upon the foregoing considerations and obviously such testimony can not be stronger than the foundation upon which it rests. On the whole record, we are of the opinion that the stock in question did have a fair market value on June 19, 1919.

A more difficult question arises when we come to determine the fair market value of the Simms Oil Co. stock. In the first place, we have the contention of the Commissioner that the best evidence as to the value of that stock is the sales of the Simms Petroleum Co. stock; in other words, since the entire capital stock of the Simms Oil Co. was exchanged for a part of the stock of Simms Petroleum Co. on June 30, 1919—only 11 days after the exchange of leases for the Simms Oil Co. stock—a determination of the value of the part of the Simms Petroleum Co. stock received should fix the value for the Simms Oil Co. stock. In view of the close proximity in point of time of the two exchanges, we think such a contention might be well taken if both stocks had been fundamentally and basically the same and there had been no unusual circumstances connected with the sales of the Simms Petroleum Co. stock, but such was not the case. The Simms Oil Co. was a Texas corporation, with the undeveloped leases as its only assets, whereas the Simms Petroleum Co.

was a Delaware corporation which owned not only the entire capital stock of the Simms Oil Co., but also had been financed through the underwriting agreement with Knauth, Nachod & Kuhne by which cash in the amount of $3,600,000 was paid into its treasury. In contrast to the relatively unknown and what might be termed " dummy " directors of the Simms Oil Co., we find the Simms Petroleum Co. manned by a board of directors of the highest class, representing some of the best known business men in the country. What, therefore, was sold on the curb market at the prices indicated in our findings was not stock which had back of it merely " wildcat " leases, but it was stock which not only had the leases back of it but also cash to the extent of four times the cost of the leases. Further, the latter stock had been made attractive to the investing public through the confidence which would be created by highly successful business men as its directors. The picture painted in the prospectus of Knauth, Nachod & Kuhne was for the sale of Simms Petroleum Co. stock and it set forth not only that it had leases but also that it had ample cash for operating and development purposes and was in every way prepared to carry forward the venture. Obviously, the price at which the stock would sell might be vastly different from that of the other and what a willing buyer would pay to a willing seller would vary in a corresponding manner. Particularly would such be true in this instance where so much concerned the participation by the bankers with the promotion of the Simms Petroleum Co. and the sale of its stock, and where there is every evidence of a market bolstered at their instigation.

Further, when we come to examine the agreements between the bankers and the petitioner, we find that the latter agreed that he would not sell his stock during a certain period while the stock was being sold by the syndicate. With such assurance on the part of the petitioner, the bankers obligated themselves to pay and did pay $25 per share to the Simms Petroleum Co. for approximately one third (144,000 shares) of that stock, but even aside from the restriction as to sale, the purchase was not as prospective permanent stockholders or even as investors, but rather as those who would effect an immediate sale or resale. Further, the cash paid in by the bankers was made available as working capital and the new corporation had a board of directors of prominent business men and capitalists who were calculated to attract prospective investors. The corporation bore the name of the petitioner and the emphasis in the prospectus included extended reference to the direction of the corporation by the petitioner and his experience and knowledge of oil properties. Upon the termination of the sales by the syndicate under the underwriting agreement, the petitioner was released from

the restrictions as to the sale of his stock in competition with the 144,000 shares sold by the bankers, and it is argued that sales thereafter would indicate market value, but again we find pooling arrangements operating to which the petitioner was a party. The record is not clear as to how extensive these latter operations were, but it is clear that the petitioner and the bankers were dealing in the stocks for several months after June 30, 1919. It is said, and one witness testified, that the purpose of the pools was to provide an orderly market, but whatever may have been the purpose it is conceded on all sides that the dealings were in what might be termed the " free " stock, that is, the 144,000 shares which were sold by the bankers and possibly the 56,000 which were delivered to Bronner. None of the 224,990 shares which were delivered to the petitioner for himself and his associate were sold during 1919, nor do we understand any of such stock was offered for sale. Some of the reasons for the failure to sell had their basis in the legal inhibitions referred to above and others were of a moral nature because of the petitioner's connection with the enterprise. But whatever the reasons, the fact remains that none of the stock which we are asked to value as a basis for a valuation of the Simms Oil Co. stock was sold and we are convinced that if it had been placed upon the market an entirely different market value would have resulted. What the net effect on the market would have been is problematical and a mere guess at best, but what we would emphasize is that there was not only a restricted, but apparently also a manipulated, market. It is true that many of the sales—perhaps most of them—were bona fide, but they were entirely of the " free " stock and in a market which we are convinced was bolstered and influenced by the petitioner and the bankers or other associates. That a market was created during their period of operations and existed after their operations ceased is a long way from saying that a market existed in June 1919, when the transactions with which we are concerned took place, wherein the petitioner could have disposed of his stock at the price prevailing on the curb exchange.

What such a market might be evidence of if all of the stock of the Simms Petroleum Co. had been the source of the sales, or what it would show as to the stock sold, is not our question; what we are asked to say is that the part which was not sold has a fair market value which is determinable from the dealings in that which was sold. The old axiom that " things equal to the same thing are equal to each other " could hardly be said to be applicable when we consider that that which was not sold was kept from the market for the very evident purpose of permitting the sale of the other stock at a better price. We are here seeking to determine not alone

"market value" but more particularly "fair market value" as that term is used in the statute. The necessity for considering the circumstances under which sales are made when sales are used as evidence of such value is well stated by the court in *Walter* v. *Duffy*, 287 Fed. 41:

Now, what is the market price? What is the fair market price of the statute? We say "fair," since every word used by Congress must be given due effect in the construction of this widely applicable statute, for obviously, while a stock might be bought and sold—and so marketed—and might thus be said to evidence some market price, yet it is obvious that Congress by the addition of the words "fair market price," certainly meant that not only must the market price be ascertained by sales, but that sales so made, the circumstances under which they were made, the subject-matter of the sales, all the attendant circumstances, were to be considered to determine whether such sales served to evidence not alone a market sale, but the fair price which Congress said should be the statutory start or base from which subsequent "gain derived" should be determined.

As to sales in a restricted market, see *Wallis Tractor Co.*, 3 B.T.A. 981, wherein we refused to accept such sales as evidence of the fair market value of the restricted stock. To a similar effect see also *Heiner* v. *Crosby*, 24 Fed. (2d) 191. While in the *Wallis Tractor Co.* case the restrictions extended much further than in the case at bar, much that was there said is here applicable—at least to the extent that the sales of the "free" stock are not necessarily controlling as to the stock of the petitioner which was not sold. Much more might be said of our reasons for rejecting the sales of the Simms Petroleum Co. stock as conclusively establishing the fair market value of the Simms Oil Co. stock on June 19, 1919, but we think the foregoing sufficient. In short, the specific property which we are valuing is the stock of the Simms Oil Co. on June 19, 1919, and we do not think a fair market value for such stock is determinable by attempting to translate the sales of "free" stock of the Simms Petroleum Co. under the conditions under which it was sold into a fair market value of the other stock of the Simms Petroleum Co. which was neither sold nor offered for sale, and, in fact, at or about the basic date in question, could not be offered for sale.

The other evidence in the record as to the value of the stock has to do with the value of the leases for which the stock was issued, and much of our voluminous record is directed to this point in the form of evidence by both parties. The contention of the petitioner is that if a fair market value is to be said to have existed for the Simms Oil Co. stock on June 19, 1919, the best evidence of such value is the fair market value of the leases which constituted the only assets of the corporation and which, he says, had a value of some $300,000 less than their cost to him. On the other hand, the

Commissioner, while insisting that the best evidence of such value is represented by the sales of Simms Petroleum Co. stock, as heretofore referred to, says that the value of the leases more than confirms a value for the stock as determined by using a fair market value for the Simms Petroleum Co. stock of $25 or more per share. In other words, the petitioner's position is that the maximum value attaching to the leases on the basic date was some $672,000, whereas the Commissioner would fix a value of from $6,000,000 to $10,000,000. Much of the large record on this point was in the form of expert testimony, though a substantial amount of it consists of documentary evidence and oral testimony as to sales and leases.

A detailed discussion or an attempted reconciliation of all the oral testimony and documentary evidence offered would unduly extend this opinion and would serve no useful purpose. In general, it might be said that we have, first, the opinions of various officers and employees of the major oil companies who were actively interested from 1917 to 1919 in the Ranger and Desdemona areas and the territory where the petitioner's acreage was located. They testified to acquisitions by their companies in those areas, both for direct development and for protection purposes. These companies kept a large force in the field, including mining engineers, geologists, scouts, and others, who were constantly in touch with developments as they occurred, both favorable and unfavorable. They were kept advised as to the wells which were being drilled and the results after their completion. Instead of the fields extending for any great distance or showing any favorable evidence of a recurrence to the south or southwest where the petitioner's acreage was located, it was found that the fields were confined to relatively narrow limits. The major companies and others had acreage in the territory where the petitioner's leases were located and some 45 or 50 wells were drilled thereon prior to June 19, 1919, but all were unsuccessful— dry holes. These witnesses, as well as those offered by the Commissioner, seem agreed that these wells were not of themselves sufficient to condemn entirely the area where petitioner's acreage was located, but that they were unfavorable factors which must be taken into consideration in valuing this property. Further, it was shown from a study of the geological structure, as evidenced by the drilling, that a sand of sufficient thickness and lateral extent to serve as a reservoir for the oil was not being found in that area.

We do not think the evidence establishes that the disappointing character of these producing areas was fully known by June 19, 1919, but we do think there was sufficient evidence then in existence to have a depressing influence on the value of oil leases in that territory. The interest in the counties where petitioner's acreage was

located was brought about almost entirely by the discovery of the Ranger and Desdemona fields, and when those fields were proving disappointing and when the drilling which had been carried out in the area where petitioner's acreage was located was not productive, the effect on the market value of petitioner's acreage becomes apparent. Various well qualified witnesses who were familiar with the conditions existing on June 19, 1919, as set out above—most of them leaders in the oil industry in that area at that time and well qualified from actual dealing in, and general knowledge of, the value of oil leases—gave opinions as to the fair market value of the leases, taking the acreage as a whole. These opinions varied from 50 cents to $2 per acre.

On the other hand, we have various witnesses who were presented on behalf of the Commissioner, though little of their evidence was in the form of opinion testimony as to the value of the acreage as a whole, most of it being directed at individual sales of small acreage for the purpose of showing the value of adjacent or nearby acreage of the petitioner. The sales varied from $1 to $6,000 per acre, depending on the location of the property and the peculiar circumstances surrounding each sale. Many of these afford little aid in the solution of our problem, because of their location, size of the acreage involved, and conditions under which made. As heretofore stated, most of the purchases which were being made by the major oil companies were in the form of protection acreage; that is, small purchases which were made not because of the proved character of the territory, but because of the fear that an owner in that locality might strike oil, and it was desired to share in whatever was developed. And again a lease might be taken which carried with it an obligation to drill a well. The cost of drilling a well at that time to the depth desired was from $30,000 to $40,000, and in order to raise the money to drill the well the lessor would sell small leases from his large holding. Further, the prices in close proximity to a proven field (such as Ranger and Desdemona) would have little or no weight in determining the value of unproved leases many miles away. None of petitioner's acreage was in and only a small part was near proved territory. Another class of purchases was represented in the promotion of small corporations, some of which were of a fraudulent nature. In other words, the sales were of relatively small acreage rather than of a spread of acreage comparable to that which we are considering. Of course, such sales are evidence of leasing activity and of value of similar property when sales are made under similar conditions, but whether we view them as evidence of leasing activity or evidence of value we must consider all factors surrounding such sales, including locations and the conditions which prompted the sales.

Some emphasis is placed by the Commissioner upon a report of L. W. White, a well known geologist, who prepared a report on the properties at the time it was proposed to carry out the transactions here in question. White had died prior to the hearing in these proceedings and the report was not submitted in evidence. What we have is a prospectus which was sent out by Knauth, Nachod & Kuhne in connection with the sale of Simms Petroleum Co. stock, and in this prospectus is an alleged quotation from the White report. The prospectus was merely admitted as proof that such a prospectus was sent out by the bankers, and not as proof that the quotation was properly from White's report. Opinion evidence appearing in the record under such circumstances can hardly be said to be very helpful in deciding the question before us. At best, the portion of the report referred to does not attempt to fix a fair market value of the leases, but " suggest[s] an estimate of twenty to twenty five million dollars as representing its value and potential possibilities." Such a generalization might be sufficient in a stock selling campaign, but it affords little aid to us when we are seeking to determine " fair market value " within the meaning of the statute. Further, the Commissioner urges upon us the par value of stock of the Simms Oil Co. ($10,000,000) which was issued for the leases as well as the affidavit filed by the incorporators fixing a cash value for the leases of $10,000,000. We think it well estabished that such evidence is not proof of the fair market value of property. *William Ziegler, Jr.,* 1 B.T.A. 186; *Stephen Ransom, Inc.,* 9 B.T.A. 120; and *Cook* v. *United States,* 30 Fed. (2d) 917.

Suffice it to say we have given the most careful consideration to the mass of evidence introduced, having in mind the possibility of error which always exists in opinion evidence given long after a basic date, the infirmities existing in the evidence offered as to sales, and all other factors both favorable and unfavorable, and we have reached the conclusion that the fair market value of the leases on June 19, 1919, was not more than their cost to the petitioner in 1917, 1918, and 1919. What we are asked to value is a vast area of some 420,000 acres of unproved oil territory, scattered over 19 large counties of Texas. The purchases were made as a result of the excitement which was aroused when the Ranger and Desdemona fields were brought in; in other words, the petitioner did not make his acquisitions on the basis of scientific geological information or of proved territory, but apparently largely on the theory that surface indications would justify the gamble that a similar producing area might be found in the territory where the leases were acquired. In spite of the unsuccessful drilling which had occurred on lands adjacent to petitioner's acreage, a different

result might be justified if the Ranger and Desdemona fields had been completely developed and proved successful at June 19, 1919. While those fields, particularly Desdemona, were being actively drilled at that date and were producing substantial quantities of oil, there was reason to believe that they would not be profitable because of the short life of the wells. Small purchases might well have been made at high prices without thorough investigation, but we are here talking in terms of a large acreage and we are asked to say that such acreage had a value which could then be realized upon for several million dollars. A fair market value for such property contemplates a willing seller with the property available for sale (the petitioner) and a buyer who was able and willing to acquire at a price measured in terms of money or money's worth. When viewed in the foregoing manner, we are of the opinion that a fair market value for the leases here in question may fairly be fixed at their cost to the petitioner.

Our ultimate question, however, as we have heretofore indicated, is not the value of the leases but rather the stock which was issued for the leases, and evidence of the value of the leases was received only for the purpose of establishing the fair market value of the stock. We have also discussed the evidence offered as to the sales of Simms Petroleum Co. stock which was received by the petitioner for his Simms Oil Co. stock shortly after June 19, 1919. After a careful consideration of all evidence offered, we are of opinion that the record supports the conclusion that the stock of Simms Oil Co. had a fair market value when received by the petitioner on June 19, 1919, and that such value is reasonably determinable at the cost of the leases to the petitioner, and his associate, namely, $972,012.94. It accordingly follows that the petitioner neither realized a gain nor sustained a loss on account of the exchange.

### Issue No. 2.

The second issue involves various questions which arise on account of a sale of the assets of E. F. Simms & Co., a partnership, to the Humble Oil & Refining Co. The partnership was formed in 1916 between H. F. Sinclair and the petitioner, each of whom owned an undivided one-half interest in certain oil properties, and after it had been operating for some five years the sale was accomplished through the execution of separate instruments by the two partners. The instruments were identical in form, except as to the use of the name of Sinclair as grantor in one case and that of the petitioner in the other, and both were executed on the same day. Likewise, each referred to the sale of an undivided one-half interest in the assets " belonging to E. F. Simms & Company, a co-partnership consisting

of E. F. Simms & H. F. Sinclair." The sale included not only oil leases and fee lands, but also cash, accounts receivable, and similar personal property. The purchaser assumed the liabilities and contracts of the partnership, except as to limitations not here material. The argument is here made by the petitioner that this was not a partnership sale in which we would compute partnership profits, but rather two individual sales in which we compute the profits as if there had been no partnership. We are unable to agree with this contention. An allegation in the petition, which is admitted in the answer, is, in effect, that there was a partnership sale and the Commissioner in his determination seems to have proceeded on that basis. It is true that we have two instruments in which the separate consideration flowing to each is set out, but we regard these as merely instrumentalities for the sale by the partnership through the medium of its partners. There had been no dissolution, as far as the record shows, of the partnership and the assets sold were referred to as belonging to the partnership. Under the laws of Texas a partnership is not a legal entity or legal person separate and distinct from its members (*Frank* v. *Tatum*, 87 Tex. 204; 25 S.W. 409, and *Williams Land Co.* v. *Crull*, 125 S.W. 339) and title to real estate belonging to a partnership is consequently vested in the partners. We know nothing of the negotiations leading up to the sale, that is, the manner in which the Humble Oil & Refining Co. negotiated for the property—whether jointly with the two partners or in some other manner—but from the identity in character and dates of the contracts of sale as well as the laws of Texas with respect to partnerships, we are of opinion that this transaction must be looked upon as a partnership sale and the profit resulting therefrom computed on that basis.

The foregoing question becomes material only because the partnership kept its books on the accrual basis whereas the petitioner was on the receipts and disbursements basis, but as a result of the view which we take of the next question it becomes largely, if not entirely, immaterial, whether we view the sale as that of the partnership or of two separate sales by the partners. The question to which we refer arises from the following circumstances: The consideration for the sale consisted of cash, $1,200,000, notes, $1,200,000, oil in the amount of 800,000 barrels to be delivered in a certain quantity per month, if the properties produced that much oil, and a 5-cent overriding royalty on all oil produced. One half of the consideration was to be paid to each partner. There is no disagreement as to the first two items, nor as to the cost to the petitioner, and as we understand the situation the petitioner has accounted for profit as the difference between cost to him of his share in the partnership and his share of the cash and notes received. What the Commissioner did was to fix

as the total consideration received the cash and notes received plus a present worth value of the royalties to be paid and the oil to be delivered. That is, the Commissioner proceeded on the theory and here contends that the rights to receive royalty payments and have oil delivered in the future represented property of a definite value then ascertainable and that, since the partnership was on the accrual basis, it was proper to include the value of such rights in the selling price and include the petitioner's proportionate part of the profit shown thereby as taxable to him, whether distributed or not. The petitioner of course takes the opposite view, namely, that both of these rights were so contingent in character that they could not be said to represent either property then actually received, or as amounts then accrued which should be included in determining the profit taxable to the partners in 1921. On the whole, we are of the opinion that the situation presented is governed by *Burnet* v. *Logan*, 283 U.S. 404, and that accordingly the petitioner's contention should be sustained. In the aforementioned case the taxpayer sold certain stock in consideration of a cash payment and the right to receive a royalty of 60 cents per ton on certain iron ore which might thereafter be produced from a certain mine. The Court, in holding that a return of capital theory should be applied rather than a closed transaction theory wherein gain or loss would be computed on the basis of the cash received plus a then present value of the royalties to be received, said:

The 1916 transaction was a sale of stock—not an exchange of property. We are not dealing with royalties or deductions from gross income because of depletion of mining property. Nor does the situation demand that an effort be made to place according to the best available data some approximate value upon the contract for future payments. This probably was necessary in order to assess the mother's estate. As annual payments on account of extracted ore come in, they can be readily apportioned first as return of capital and later as profit. The liability for income tax ultimately can be fairly determined without resort to mere estimates, assumptions, and speculation. When the profit, if any, is actually realized, the taxpayer will be required to respond. The consideration for the sale was $2,200,000 in cash and *the promise of future money payments wholly contingent upon facts and circumstances not possible to foretell with anything like fair certainty.* The promise was in no proper sense equivalent to cash. It had no ascertainable fair market value. The transaction was not a closed one. Respondent might never recoup her capital investment from payments only conditionally promised. Prior to 1921, all receipts from the sale of her shares amounted to less than their value on March 1, 1913. She properly demanded the return of her capital investment before assessment of any taxable profit based on conjecture. [Italics supplied.]

And, further, it was said that " a promise to pay indeterminate sums of money is not necessarily taxable income."

It is urged by the Commissioner that the foregoing case may be distinguished from the case at bar on the ground that in the former

case the taxpayer was on the receipts and disbursements basis, whereas we are here determining partnership income on the accrual basis, which is taxable to the petitioner whether distributed to him or not. We do not so understand the *Logan* case, but rather that the court refused to consider the royalties as a part of the consideration, until actually received, because of their contingent character. An item accrues when all events have occurred necessary to fix the amount to be paid and determine the liability of the party to pay it. *United States* v. *Anderson*, 269 U.S. 422. One very essential element in the accrual of the royalties and in an accrual on account of the delivery of oil was the production of oil, and the occurrence of this event or these recurring events was even more uncertain than the production of iron ore in the *Logan* case, since, as contrasted with the fixed nature of iron ore, oil is fugitive, elusive, and migratory in character. A " gusher " of today may be a mere " pumper " or even a dry hole tomorrow. In reaching this conclusion we are not overlooking the fact that the undelivered portion of the contract for the delivery of oil was sold by the petitioner in 1922 for a substantial amount, but until that occurred the amount which he would receive was uncertain and contingent in character. Nor do we regard it as material that in the *Logan* case the entire capital cost had not been returned either by cash payments made at the date of the sale or through the payment of that amount plus the royalties paid from the date of the sale through the years involved in the court proceedings, whereas in the instant proceedings the capital cost and more were returned at the date of the sale. In either event, we regard the principle the same, namely, all amounts in excess of the capital cost would be taxable when received or reduced to a certainty. It follows that the petitioner's contention on this question should be sustained.

In the next place, it is contended by the petitioner that the Commissioner erroneously refused to reduce the one half of the consideration referred to in the sales agreements as payable to the petitioner by the part thereof belonging to and payable to Henry Oliver. What occurred was that after the petitioner and Sinclair had formed the partnership (E. F. Simms & Co.) Oliver acquired from the petitioner an undivided one-half interest in petitioner's share of certain of the assets of the partnership. The exact interest which Oliver acquired does not definitely appear, though the parties seem agreed, and the distribution of the proceeds was made on the basis, that Oliver was entitled to one fourth of the proceeds which would otherwise have gone to the petitioner. Oliver was not a partner in the partnership of E. F. Simms & Co., but occupied a relationship to the petitioner under which his share of the profits from the partner-

ship would be paid to him by the petitioner, and this arrangement was carried out upon the sale of the partnership assets, that is, one fourth of petitioner's one half of the proceeds went to Oliver.

The contention of the Commissioner is that since Oliver was not a member of the partnership one half of the profits from the sale must first be taxed to the petitioner without any reduction on account of the Oliver interest, citing *E. W. Battleson*, 22 B.T.A. 455; affd., 62 Fed. (2d) 125. We are of opinion that the fact that Oliver was not a partner is not controlling as to the person to whom the profit should be taxed. Oliver's interest was not merely in the income, but also in the corpus which produced the income, and in this latter respect the case at bar is to be distinguished from that line of cases, typified by *Ormsby McKnight Mitchel*, 1 B.T.A. 143; *Charles P. Leininger*, 19 B.T.A. 621; affd., *Burnet* v. *Leininger*, 285 U.S. 136; and *Mitchel* v. *Bowers*, 15 Fed. (2d) 287, wherein there was an assignment of income without the assignee becoming interested as owner in any part of the corpus. Oliver reported a profit on the transaction based on the difference between the amount invested by him in the venture and the share of the proceeds from the sale allocated to him. We are not concerned with the profit reported by Oliver nor with whether the petitioner made a profit when he sold an interest in his interest to Oliver, but we are concerned with the taxation of the profits on account of the sale in 1921 of the entire partnership assets and as to these profits we are unwilling to say that one half should be taxed to the petitioner when prior thereto he had sold a part of his interest in such assets to another person and such other person received his share of the proceeds upon which he paid a tax. It accordingly follows that the petitioner's contention on this point is sustained.

## Issue No. 5.

The proceeding was reopened to permit the petitioner to amend its petition by the assignment of additional errors by reason of the decision of the Supreme Court in *Palmer* v. *Bender*, 287 U.S. 551. This issue is whether, in computing gain on the transfer by petitioner of certain producing oil leases to the Humble Co., he is entitled to deductions for depletion based on discovery value, to be taken against the gross consideration received on such sale. The facts in respect of this issue were stipulated, and we have for decision the proper application of the statute (sec. 214, Revenue Act of 1921) in the light of recent court decisions.

Under the decision in *Palmer* v. *Bender*, *supra*, we are of opinion that the petitioner is entitled to depletion deductions based upon discovery value in respect of the 5 cents per barrel overriding royalty,

and as to the oil delivered in 1921 and 1922 under the right reserved in the contract to receive oil; and that this right to receive oil is properly allocable as consideration for the transfer of the leases, as distinguished from equipment.

The petitioner also claims that the consideration received in 1922 from the sale of his right to receive further oil payments should be allocated as consideration for the transfer of the producing leases and subject to depletion. The stipulated facts show that in 1921 petitioner sold the leases and as part consideration therefor was to receive 400,000 barrels of oil over a period of time; that on November 8, 1922, he sold the right to receive further oil as of January 1, 1923, for a cash consideration which amounted to $278,833.36, and said amount has been included as income in 1922. The question is, Should depletion be allowed as against this amount, based on discovery values? We are of opinion that the petitioner is not within the *rationale* of the decisions upon which he relies in respect of this claim. He cites, in addition to *Palmer* v. *Bender*, *supra*, *Alexander* v. *Continental Petroleum Co.*, 63 Fed. (2d) 927, and *Mrs. A. H. Murchison*, 28 B.T.A. 257, to support his position. These cases are distinguishable from the facts in the present case, in that in all of those cases an economic interest was retained in respect of the oil payments, while here, the petitioner sold his right to receive oil as of January 1, 1923, and thereafter had no economic interest in the oil in respect of that right. He is allowed depletion herein in 1921 and through 1922, at which time his right to receive oil ceased, and we believe the right to the deduction is not permissible under the statute or the decisions relied upon.

The interest of Oliver in these properties has been upheld, *supra*, and proper adjustments in the depletion deductions should be made in respect of his interest under the Rule 50 computation.

An issue was made by petitioner of his right to the benefit of the surtax limitation provided in section 211 (b) of the Revenue Act of 1918 on the sale by E. F. Simms & Co. to the Humble Co. of the properties enumerated in the findings. This issue has now been abandoned.

### Issue No. 3.

The third major issue presented arises on account of a transaction by which in 1921 the petitioner transferred 36 shares of stock of the American Sulphur Royalty Co. to his wife in satisfaction of an indebtedness of $850,000 then owing by him to her. The shares of stock were owned by the petitioner on March 1, 1913, and apparently the cost to the petitioner was less than the March 1, 1913, value—at least the parties have dealt with the stock on that basis and the record

justifies our proceeding in the same manner. Likewise, there is no question raised as to the bona fides of the transaction; the debt has been treated throughout the proceedings as valid and subsisting and the transaction as if carried out at arm's length. What the Commissioner did was to determine a profit on the transaction on the theory of a sale in 1921 of the 36 shares of stock for the amount of the indebtedness, measuring such profit by the difference between a March 1, 1913, value of the stock (less certain adjustments) and the amount of the indebtedness.

The first contention advanced by the petitioner is that income within the meaning of the Sixteenth Amendment could not arise from such a transaction, basing such contention on the theory that " the mere improvement in financial condition as shown by a taxpayer's balance sheet after the elimination of liabilities therefrom does not constitute taxable income." We are of opinion that such a position is not tenable. Certainly, if the petitioner had sold the stock for $850,000 and had used such amount in satisfaction of the indebtedness, a taxable profit would have arisen on account of the sale, leaving out of consideration any question as to the cost and March 1, 1913, value being less than the selling price. We do not think the situation is changed because the stock is used directly with the creditor in satisfying the indebtedness; the position of the petitioner after the transactions were completed would have been the same in each instance. The petitioner's contention on this point is accordingly denied. Cf. *United States* v. *Kirby Lumber Co.*, 284 U.S. 1, and *Commissioner* v. *Woods Machine Co.*, 57 Fed. (2d) 635; certiorari denied, 287 U.S. 613.

The principal controversy on this issue arises on account of differences between the parties as to the March 1, 1913, value of the stock of the American Suphur Royalty Co. which was used in satisfaction of the indebtedness in question. No sales were made of the stock at or about the basic date in 1921 nor apparently even at any time prior to that date. Resort was therefore had to expert testimony and documentary evidence, both as to the value of the assets back of the stock and as to the value of the stock itself, which is our ultimate concern. The contention of the petitioner on the basis of the evidence presented is that the stock had a value on March 1, 1913, of $30,000 per share, whereas the Commissioner contends that such value was $10,000 per share or at least not more than a maximum of $15,000 per share. The determination of the Commissioner is based upon a March 1, 1913, value of $19,631.35, less an amount referred to as " March 1, 1913, value returned to stockholders to date of sale " (apparently dividends), which gave an amount of $8,977.11 per share to be deducted from the

selling price. No contention is made that it was proper to make the reduction as made by the Commissioner; in other words, the parties are agreed that if the transaction is held to be taxable (as we have heretofore held herein) the profit (if any) will be reflected by the difference between the March 1, 1913, value so found and the selling price, that is, the amount of the debt liquidated.

Since there had been no sales of the American Sulphur Royalty stock and since the only asset of that company was the contract of the petitioner with Swenson & Sons (exclusive of undistributed cash paid thereunder), the principal part of the evidence was directed at a valuation of the contract, which, in turn, depended on the recoverable sulphur at Bryan Heights on which royalties would be paid under the contract. Three reports were prepared shortly prior to March 1, 1913, as to the sulphur content, and in view of the importance attached thereto by the parties we have referred to them at some length in our findings. The first was prepared for a group of prospective purchasers by Seely W. Mudd, acknowledged by both sides to be one of the eminent mining engineers in the country. His report showed a gross tonnage of approximately 7,500,000 long tons. Strong objection is made by the petitioner to his report on the ground of his unfamiliarity with a sulphur property, but in view of the evidence offered as to the similarity in methods generally pursued in estimating the content of a sulphur mine as compared with those used in estimating ore reserves of a different character where Mudd had had much experience, this objection loses much of its weight. Particularly, it would seem that the objection would more properly apply to the amount of the content which was recoverable rather than to the gross content itself. The recovery suggested in his report was approximately 75 percent of the gross tonnage.

Following the submission of the Mudd report, a report was submitted by Ben Andrews, a mechanical engineer of acknowledged ability, who had several years of experience in exploration work on the particular properties involved. From a practical standpoint he was unquestionably well qualified to report on the properties, though he was not a mining engineer and the record does not show that he had ever had any experience in estimating the content of a mine, whether sulphur or some other mineral. His experience seems to have been largely in drilling oil wells and in sulphur work on petitioner's property and that of the Union Sulphur Co. By this we do not mean that his report is to be disregarded; on the contrary, we are satisfied that it contains much of merit and is based upon a first-hand knowledge of the properties, but we are unwilling to accept its ultimate conclusion as a basis for the reasonably expected

recoverable tonnage. He estimated a gross tonnage of 17,000,000 short tons.

The Andrews report was followed by a second report by Mudd which was directed largely at the Andrews report, pointing out what Mudd considered inaccuracies or errors on the part of Andrews, such as the use of a short ton for measuring sulphur instead of the long ton which is the basis upon which royalties were paid under the contract, failure to give proper consideration to the porosity of the formation, consideration of deposits not commercially workable, and other similar criticisms. Some slight changes were suggested from his (Mudd's) previous report, though it would not have resulted in a very material increase from his previous report.

In addition to the foregoing, a report was made by Browne (Mudd's assistant on the earlier reports) in 1920 in which he estimated a recoverable content as of March 1, 1913, of approximately 4,000,000 tons. We have further the testimony of various witnesses for the petitioner and the Commissioner who testified as to both the estimated gross tonnage on March 1, 1913, and the percentage of recovery reasonably to be expected at that time, such testimony ranging from approximately 50 to 85 percent. The testimony differed little as to the probable time which would be required to recover the sulphur in question, namely, from 17 to 20 years. The actual sulphur produced by the property to the date of the hearing in February 1931, was 4,200,000 tons and we are satisfied from the evidence that the reasonably expected remaining recovery at that time was approximately 600,000 tons. From all the evidence submitted, we are of opinion that the amount which has been recovered plus the amount now expected to be recovered is not substantially less than what could reasonably have been expected on March 1, 1913—at least, we do not think the recovery then reasonably to have been expected on the basis of the methods being pursued would have exceeded 6,000,000 tons, though, of course, there was the additional speculative element which might be said to have existed because of the possibility that improved methods might result in a greater percentage of recovery of the estimated gross tonnage.

In addition to a present worth of the expected royalties which would form a basis of valuing the only asset back of the stock in question, the petitioner urges that the stock had a large value from a monopolistic standpoint—that is, he urges that, since the Bryan Heights properties and the Union Sulphur properties in Louisiana constituted the only known sulphur properties in this country, the opening of the mine at Bryan Heights threatened to destroy the monopoly then controlled by the Union Sulphur, and that in any trade involving the acquisition or disposition of Bryan Heights it

would be necessary to acquire the stock here in question, thus giving to the stock a large value over and above the value of its royalty rights. We are unable to see much merit in this contention. Of course, anyone acquiring the Bryan Heights properties would have to pay the royalties set out in the contract entered into between the petitioner and Swenson & Sons, but we fail to see anything in the contract which would prevent the sale of the Bryan Heights properties by Swenson & Sons (or their successor) without the approval of the American Sulphur Royalty Co. In fact, Swenson & Sons was succeeded by the Freeport Sulphur Co. and it is not suggested that the Royalty Co. or its stockholders were parties to such action. The obligation to mine sulphur under the royalty contract of course existed, but, in view of the evidence offered as to the rapidly increasing demand for sulphur, we do not think it would seriously impair the value of the properties from a monopolistic standpoint or otherwise to be required to mine sulphur as required by the royalty contract, that is, proceed with due diligence in the development and operation of the properties.

In addition, we have the testimony of the petitioner and one of his witnesses that the stock in question had a fair market value on March 1, 1913, of $30,000 per share and the testimony of a witness for the respondent of a then value of $10,000 per share. We have given careful consideration to this evidence, as well as to the present worth on March 1, 1913, of the expected royalties to be received under the contract. We have also considered all other evidence presented as to the value of the stock in question and have reached the conclusion that its fair market value on March 1, 1913, was $20,000 per share. The petitioner accordingly realized a profit in 1921 of the difference between $850,000 (the debt satisfied) and $720,000 (36 shares at $20,000 per share), or $130,000.

### Miscellaneous Errors Pertaining to Racing Stables and Wagering Losses.

In the petition an error was assigned as to the profit in 1921 on the sale of thoroughbred horses, but no satisfactory evidence was introduced in support thereof and in his brief the petitioner stated that he was " compelled to abandon this item." The Commissioner is accordingly sustained as to this issue.

The Commissioner is likewise sustained as to an item of $26,004.23 which he capitalized in the determination of the deficiency now before us for 1921. The only witness who testified on this point stated that he was unable specifically to allocate these costs to any particular unit of construction and apparently for this reason charged them to expense. Since the amount was expended for fix-

tures, radiators, roofing, and heating equipment which might well form a part of the permanent and initial capital costs, we can see no basis in the record to disturb the Commissioner's action.

A third item comprises amounts expended in 1921, totaling $29,-566.64, for the construction of temporary buildings for housing laborers engaged in a construction program and for storehouses. The petitioner urges their allowance as a deduction in 1921 on the ground of their temporary character, citing *Robert Buedingen*, 6 B.T.A. 335. In the foregoing case, however, the cost of temporary construction therein allowed as a deduction represented expenditures made in a given year where the facilities had no use or value beyond the year when constructed. The term " temporary buildings " may well connote buildings with only a short life, but unless it is shown that such structures had no useful life beyond the year in which constructed, it is not proper to treat their entire cost as a deductible expense of the year in which expended. Since the foregoing has not been shown and since we do not know the useful life of the buildings in question, the action of the Commissioner in capitalizing this amount and adding it to the cost of improvements for depreciation purposes is sustained.

The final issue is whether the petitioner is entitled to a deduction in 1921 on account of losses from betting on horse races in excess of the amount won from the same source. Some of the bets were made in Kentucky and Maryland and some in New York. The petitioner was unable to say whether bets had been placed in other states, nor was he able to make any allocation among the states named of the amount lost. We have heretofore held that gambling losses, where the gambling took place in a state which prohibited such acts, were not allowable deductions since they were not losses " incurred " in " transactions " entered into for profit within the meaning of the governing statute. *Mitchell M. Frey, Jr., et al., Executors*, 1 B.T.A. 338; *M. Rea Gano*, 19 B.T.A. 518; and *Louis D. Beaumont*, 25 B.T.A. 474. By the laws of New York (secs. 991 and 992 of the Penal Laws of New York), bets made at a race track in that state are unlawful and any contract on account of such act is void. Since some of the losses here in question arose on account of bets placed in New York and since we have no segregation of the amount as between the states where they might be allowable and where they are not allowable, the action of the Commissioner in denying the entire amount must be sustained. The case of *George D. Widener*, 8 B.T.A. 651, cited by the petitioner, is not controlling since the deductions there allowed as expenses in the conduct of a racing stable did not include losses in betting on races; in fact, it was specifically found that the petitioner did not bet on the races. Further,

we are not convinced from the evidence here presented that betting on the races was an ordinary and necessary expense of the petitioner in training race horses and operating a racing stable—certainly the evidence is far from conclusive that the bets were placed by the petitioner exclusively on his own horses, but rather it would appear that he bet on horses as it suited his fancy. We do not think the evidence supports a finding that they would constitute an ordinary and necessary expense of petitioner's business.

Reviewed by the Board.

*Judgment will be entered under Rule 50.*

---

BLACK, dissenting: I dissent from the majority opinion which holds that the transfer of the oil leases in question by E. F. Simms to the Simms Oil Co., a Texas corporation, in consideration of all its capital stock and the contemporaneous transfer of all this capital stock to Simms Petroleum Co., a Delaware corporation, in consideration of 174,990 shares of its stock, were separate taxable transactions. It is my view that they are parts of one transaction by which Simms sold his oil leases to the Delaware corporation in consideration of 174,990 shares of its capital stock and that Simms' gain or loss in the transaction is measured by the difference between the cost of his leases and the fair market value of the 174,990 shares Simms Petroleum Co. (Delaware corporation) stock at the time he received it. We had practically this same question and situation in *Teck Hobbs*, 26 B.T.A. 241. In that case, petitioner Henry Hobbs and about 30 associates were the owners of various oil leases in the Burkburnett oil field in Texas. In November 1919, Hobbs and his associates agreed to sell these oil leases to a group of individuals in New York City, headed by C. N. Haskell. After the negotiations had progressed a while, it was agreed that a Delaware corporation should be organized, just as it was agreed in the instant case that a Delaware corporation, the Simms Petroleum Co., should be organized. It was further agreed that the oil leases owned by Hobbs and his associates should not be transferred directly to the Delaware corporation, but that Hobbs and his associates should organize a Texas common law trust, to be called Hobbs Oil Co., all of its capital stock to be issued to Hobbs and his associates in payment of the leases, and then Hobbs and his associates were immediately to transfer this stock of the Hobbs Oil Co. to the Delaware corporation, as had been agreed upon.

Under such circumstances we held that it was all part of one transaction, to wit, the selling by Hobbs and his associates of their

oil leases to the Delaware corporation for stock of the latter and cash. In that case we said:

Petitioners' next contention is that the transfer by Hobbs and associates of their oil properties to the Hobbs Oil Company, a joint stock association, was a taxable transaction completed in 1919, and that the value of that stock so received in 1919, rather than the cost of the properties so exchanged for said stock, is the proper basis for determining the profit on the sale of the Hobbs Oil Company stock in 1920 to C. N. Haskell and associates.

In determining the gain of petitioners in the Haskell transaction, the respondent took as his basis the cost of the property which petitioners conveyed to the Hobbs Oil Company, while it is contended by petitioners that the proper basis was the fair market value of the Hobbs Oil Company stock on the date of its issue, December 15, 1919; that said stock was worth more on that day than they received for it; and that a loss was sustained rather than a gain.

We do not agree to this contention. The organization of the Hobbs Oil Company and the transfer to it of the lands and leases was merely a part of one main transaction, which was to sell certain oil lands and interests in oil lands which were specified in the contract, plus 75 per cent of the stock in the Texas Chief Oil & Gas Company, for a consideration of $2,100,000 cash and $600,000 capital stock of the Delaware Company. The fact that to perform the contract the organization of a common law trust or association was resorted to as a means to carry through the deal, does not alter the character of the transaction. There was no intention on the part of Hobbs or his associates to effect an exchange of their oil lands for stock in the Hobbs Oil Company, but their intention was to make a sale of their lands to Haskell and the Delaware Company by which they were to receive a large part of the agreed purchase price in cash and the balance in stock of the Delaware Company. All the shares of stock of the Hobbs Oil Company were issued to Hobbs and by him immediately sent to New York for delivery to the Delaware Company to be held by it as a part of its own property. No owner of the oil lands and leases conveyed to the Hobbs Oil Company had any beneficial interest in or power of disposition over the stock, as it belonged to the Delaware Company as soon as issued. The interest of the owners of the oil lands and leases conveyed to Hobbs Oil Company was in the consideration which they were to receive under the main contract and supplements thereto. We hold that the respondent was correct in fixing, as the basis for the calculation of gain, the cost of the oil properties to petitioners. *Commissioner* v. *Moore*, 48 Fed. (2d) 526; certiorari denied, October 12, 1931; *Commissioner* v. *Garber*, 50 Fed. (2d) 588.

Just as we said in the foregoing quotation, that " The organization of the Hobbs Oil Co. and the transfer to it of the lands and leases was merely a part of one main transaction," to sell the leases and other property to the Delaware corporation, so do I say that in the instant case the organization of the Simms Oil Co. (Texas corporation) and the transfer to it of the oil leases were merely a part of one main transaction, which was to sell these leases to the Delaware corporation. That petitioner himself looked upon these transactions as parts of one completed transaction is disclosed by his pleadings.

In his original petition he says: "In June of that year (1919) he transferred said undeveloped leases to the Simms Oil Co., a Texas corporation, in return for which all of the stock of said Simms Oil Co. except qualifying shares were issued to petitioner. *Contemporaneously* petitioner transferred all of the shares of Simms Oil Co. to the Simms Petroleum Co., a Delaware Corporation." (Italics supplied.) A similar statement is contained in the amended petition filed in September 1927.

Because I believe that there are no facts in the instant case on the point which I am here discussing sufficient to distinguish it from the facts in the *Hobbs* case, *supra*, and because I believe our holding in the *Hobbs* case was correct, I record my dissent from the majority opinion in the instant case.

I think the Commissioner treated the transaction correctly when he held that the leases owned by Simms were exchanged for 174,990 shares of the Simms Petroleum Co. (Delaware corporation) and treated the intermediate transactions as but parts of the one main transaction. The measure of gain, as I have said, is the difference between the cost of these leases and the fair market value of the shares in the Delaware company which Simms received.

MATTHEWS agrees with this dissent.